Keating, J.
The issue on this appeal is whether a 1960 amendment to the Building Zone Ordinance (altering the Zoning Map) of the Village of Lake Success, which reclassified appellant’s property from Business “A” and “ B ” to Residence “ C ”, is valid. Appellant claims that the rezoning was discriminatory, confiscatory and ultra vires.
The background of the dispute is this: The Village of Lake Success is a small, suburban community in the extreme westerly portion of Nassau County. It has a rather irregular shape, but generally is bounded on the south by the Northern State Parkway and on the north and east by the Town of North Hempstead. To the west lies its giant neighbor, the City of New York.
The village is approximately two square miles in size. Running through it in a generally north-south direction is the main artery of the village, Lakeville Road. That street intersects with Northern Boulevard, a major east-west thoroughfare in this section of Long Island.
The village’s northern boundary appears to be completely arbitrary. For the most part, it is to the south of Northern Boulevard. However, along Lakeville Road, the village reaches out in a northerly direction to touch Northern Boulevard. The area is not large and is neck-like in shape, consisting of several hundred feet on either side of Lakeville Road extending from Northern Boulevard some 750 feet to University Road on the west side of Lakeville Road and some 600 feet to Cumberland Avenue on the east. Cumberland Avenue and University Road form what may be described as the base of the neck.
Prior to the 1960 rezoning in question, almost the entire neck was zoned for business. For a distance of some 400 feet south of Northern Boulevard, the area was zoned Business “A ” which permitted retailing and similar uses as well as laboratories and office and public buildings. The rest of the neck was zoned Business “ B ” where essentially the only nonresidential use allowed was neighborhood retailing.
*467 Two parcels of land were initially the subject of this litigation. They are located in this neck and constitute a substantial portion of it. However, as a result of this litigation, only one parcel is now in question. It consists of approximately two and one-half acres, covering all of the area formerly zoned Business “A” on the east side of Lakeville Road, except for a 100 by 100-foot plot in the northwest corner of the parcel at the intersection of Northern Boulevard and Lakeville Road which is occupied by a gasoline station. Twenty-four feet of the southern end of the parcel extend into the former Business ‘ ‘ B ’ ’ zone. Appellant also owns land, adjacent to and east of this property in the Town of North Hempstead.
When appellant assembled this east parcel in 1951, the only use being made of this property was in the northerly portion facing Northern Boulevard. It was then being operated as a restaurant.
Also in 1951, plaintiff acquired two and one-half acres of vacant lots on the west side of Lakeville Road. This property covered almost the entire block from Lakeville Road to University Place, one block to the west of Lakeville Road, and from Northern Boulevard for a distance of approximately 500 feet to the south towards University Road, except for a few lots facing University Place to the west. Like the northwest corner of the east parcel, the northeast corner of this property is also occupied by a gas station, not owned by appellant.
The zoning amendment,, ordinance No. 60, placed the entire neck, except for a 100-foot-wide strip adjacent to Northern Boulevard, in a Residence “ C ” category. Thus, the northeast and the northwest corners of the east and west parcels, respectively, that is the land fronting on Northern Boulevard, are not directly involved in this proceeding since the rezoning did not affect those portions of appellant’s property. Permitted uses in the new classification include public and religious buildings and residences with minimum plot size set at 13,000 square feet and minimum frontage of 100 feet on Lakeville Road.
The trial court held the rezoning with respect to the so-called west parcel unconstitutional as being confiscatory, but sustained the ordinance insofar as it affected the east parcel (Udell v. McFadyen, 40 Misc 2d 265). The decision with respect to the west parcel rested on three grounds. First, there was the *468 size and shape of the plot; second, the topography of the land, which sloped down some 15 feet from Lakeville Road to University Place; and third, the existing neighboring uses. After a careful evaluation of the evidence, the trial court concluded that ‘ ‘ residential zoning precludes use for any purpose to which it is reasonably adaptable ” (40 Misc 2d 265, 271). It also held the rezoning to be discriminatory, of which more will be said later.
With respect to the east parcel, however, a contrary conclusion was reached as to the validity of the ordinance. In essence, the court held that since the appellant also owned contiguous lots fronting on Summer Avenue in the Town of North Hempstead, residential use was practical for the east parcel since the residences could face Summer Avenue. In addition, it found residential zoning would not be inconsistent with the character of the neighborhood and that a nursery school located on the south side of the east parcel was not incompatible with residential use. The problem raised by the commerce of Northern Boulevard could be remedied by appropriate fencing.
Both sides appealed this decision. During the pendency of the appeal, the village passed a second amendatory ordinance rezoning the west parcel into a new Business “ G ” category, which permitted ‘‘ such scientific and/or research laboratory use, offices for executive, administrative, banking or professional purposes, libraries, schools, telephone exchanges and municipal building uses, as may be approved by the Village * * * upon recommendation of the Planning Board ’’. Following this second change, the village withdrew its appeal.
On the landowner’s appeal, the Appellate Division affirmed. Justice Hopkins, dissenting, stated in a brief opinion that he could see no justification for treating the two properties differently and that the “ same considerations that prompted the declaration of invalidity of the ordinance exist on the one side of Lakeville Road as on the other ” (27 A D 2d 750, 751).
We hold that ordinance No. 60 is invalid with respect to the east parcel as well as the west parcel. We have concluded that the rezoning was discriminatory and that it was not done “ in accordance with [the] comprehensive plan ” of the Village of Lake Success (Village Law, § 177). In our view, sound zoning principles were not followed in this case, and the root cause of *469 this failure was a misunderstanding of the nature of zoning, and, even more importantly, of its relationship to the statutory requirement that it be “ in accordance with a comprehensive plan.”
Zoning is not just an expansion of the common law of nuisance. It seeks to achieve much more than the removal of obnoxious gases and unsightly uses. Underlying the entire concept of zoning is the assumption that zoning can be a vital tool for maintaining a civilized form of existence only if we employ the insights and the learning of the philosopher, the city planner, the economist, the sociologist, the public health expert and all the other professions concerned with urban problems.
This fundamental conception of zoning has been present from its inception. The almost universal statutory requirement that zoning conform to a “well-considered plan” or “ comprehensive plan ” is a reflection of that view. (See Standard State Zoning Enabling Act, U. S. Dept, of Commerce [1926].) The thought behind the requirement is that consideration must be given to the needs of the community as a whole. In exercising their zoning powers, the local authorities must act for the benefit of the community as a whole following a calm and deliberate consideration of the alternatives, and not because of the whims of either an articulate minority or even majority of the community. (De Sena v. Gulde, 24 A D 2d 165 [2d Dept., 1965].) Thus, the mandate of the Village Law (§ 177) is not a mere technicality which serves only as an obstacle course for public officials to overcome in carrying out their duties. Rather, the comprehensive plan is the essence of zoning. Without it, there can be no rational allocation of land use. It is the insurance that the public welfare is being served and that zoning does not become nothing more than just a Gallup poll.
Moreover, the “ comprehensive plan ” protects the landowner from arbitrary restrictions on the use of his property which can result from the pressures which outraged voters can bring to bear on public officials. “ With the heavy presumption of constitutional validity that attaches to legislation purportedly under the police power, and the difficulty in judicially applying a ‘ reasonableness ’ standard, there is danger that zoning, considered as a self-contained activity rather than as a means to a broader end, may tyrannize individual property owners. Exercise of the legis *470 lative power to zone should be governed by rules and standards as clearly defined as possible, so that it cannot operate in an arbitrary and discriminatory fashion, and will actually be directed to the health, safety, welfare and morals of the community. The more clarity and specificity required in the articulation of the premises upon which a particular zoning regulation is based, the more effectively will courts be able to review the .regulation, declaring it ultra vires if it is not in reality ‘ in accordance with a comprehensive plan. ’ ” (Haar, “ In Accordance With a Comprehensive Plan ”, 68 Harv. L. Rev. 1154,1157-1158.)
As Professor Haar points out, zoning may easily degenerate into a talismanic word, like the “ police power ”, to excuse all sorts of arbitrary infringements on the property rights of the landowner. To assure that this does not happen, our courts must require local zoning authorities to pay more than mock obeisance to the statutory mandate that zoning be “in accordance with a comprehensive plan ”. There must be some showing that the change does not conflict with the community’s basic scheme for land use.
One of the key factors used by our courts in determining whether the statutory requirement has been met is whether forethought has been given to the community’s land use problems. (See 68 Harv. L. Rev. 1154, 1171; Note, Comprehensive Plan Requirement in Zoning, 12 Syracuse L. Rev. 342, 344-345.)
Where a community, after a careful and deliberate review of ‘ ‘ the present and reasonably forseeable needs of the community ’ ’, adopts a general developmental policy for the community as a whole and amends its zoning law in accordance with that plan, courts can have some confidence that the public interest is being served (Rodgers v. Village of Tarrytown, 302 N. Y. 115, 121-122; Thomas v. Town of Bedford, 11 N Y 2d 428, 434). Where, however, local officials adopt a zoning amendment to deal with various problems that have arisen, but give no consideration to alternatives which might minimize the adverse effects of a change on particular landowners, and then call in the experts to justify the steps already taken in contemplation of anticipated litigation, closer judicial scrutiny is required to determine whether the amendment conforms to the comprehensive plan.
*471 The role of these experts must be more than that of giving rationalizations for actions previously decided upon or already carried out. In recent years, many experts on land use problems have expressed the pessimistic view that the task of bringing about a rational allocation of land use in an ever more urbanized America will prove impossible. But of one thing, we may all be certain. The difficulties involved in developing rational schemes of land use controls become insuperable when zoning or changes in zoning are followed rather than preceded by study and consideration.
By this statement, we do not mean to imply that the courts should examine the motives of local officials. What we do mean is that the courts must satisfy themselves that the rezoning meets the statutory requirement that zoning be “ in accordance with [the] comprehensive plan ” of the community.
Exactly what constitutes a “ comprehensive plan ” has never been made clear. Professor Haar in his article discusses most of the meanings which courts have given the term. In the conclusion of his article he notes (68 Harv. L. Rev. 1173): “ As we have seen, the courts have taken a number of rather different approaches in testing zoning measures for consonance with the enabling act mandate of ‘ accordance with a comprehensive plan.’ None of the meanings suggested—broad geographical coverage, ‘ policy ’ of the planning or zoning commission, the zoning ordinance itself, the rational basis underlying the ordinance — do extreme violence to the statutory wording. But all of them share a common defect: they emphasize the question whether the zoning ordinance is a comprehensive plan, not whether it is in accordance with a comprehensive plan. Thus construed, the enabling act demands little more than that zoning be ‘ reasonable,’ and impartial in treatment, to satisfy the constitutional conditions for exercise of the state’s police power.”
No New York case has defined the term “ comprehensive plan ”. Nor have our courts equated the term with any particular document. We have found the “ comprehensive plan” by examining all relevant evidence (Rodgers v. Village of Tarrytown, 302 N. Y. 115, 122, supra; Thomas v. Town of Bedford, 11 N Y 2d 428, 434-435, supra). As the trial court noted, generally New York cases “ have analyzed the ordinance * * * in *472 terms of consistency and rationality ” (40 Misc 2d 265, 267-268). While these elements are important, the “ comprehensive plan ” requires that the rezoning should not conflict with the fundamental land use policies and development plans of the community (see Santmyers v. Town of Oyster Bay, 10 Misc 2d 614, 616; Linn v. Town of Hempstead, 10 Misc 2d 774; Place v. Hack, 34 Misc 2d 777; Walus v. Millington, 49 Misc 2d 104). These policies may be garnered from any available source, most especially the master plan of the community, if any has been adopted, the zoning law itself and the zoning map.
In the case at bar, the search for the village’s “comprehensive plan ’ ’ is relatively easy. It may be found both in the village’s zoning ordinance and in its zoning map.
In 1925 the Village of Lake Success adopted its first zoning ordinance. At least since 1938, appellant’s parcel has been placed in a business use district. Over the years, various amendments were passed, none of them, however, affecting appellant’s property. If anything, the changes tended to reinforce the conclusion that the community had decided that the neck of land was most appropriately fitted for business use because of its proximity to Northern Boulevard. Thus, in the early 1950s the west side of University Place near Northern Boulevard was rezoned for business use.
When appellants acquired the parcel, it had been zoned for business use for some 12 or 13 years and so it remained for the next 8 or 9 years.
In 1958 the village undertook to set forth expressly the essential development goals of the community. It did so in the form of an amendment to the zoning ordinance and entitled the statement a ‘ ‘ developmental policy ’ ’. According to the statement, Lake Success was and was to remain a suburban community of low density, one-family residential development. Other uses were to be permitted only to the extent that they were related to residential use, e.g., schools, churches and community institutions, or as they might contribute to the strengthening of the tax base of the community.
If one examines the zoning map of the village as it stood prior to June, 1960, this policy is carried out almost perfectly. Only a small portion of the community’s land was zoned for business *473 use. It is important to note that almost, if not, every piece of property in the nonresidential category was located on the periphery of the community, usually adjacent to lands in neighboring communities with similar nonresidential use. Consistent with this “ developmental policy”, a portion of the northeast section of the community had previously been rezoned for commercial use.
Thus, as matters stood on the morning of June 21, 1960, the village had a zoning plan with stated community goals and a zoning map which consistently carried out these policies.
On June 21,1960 Fred Budinger, an associate of the appellant, appeared at the village’s offices with a preliminary sketch for the development of the vacant west parcel with a bowling alley and a supermarket or discount house. That same evening, the village planning board recommended a change in zoning from business to residential use.
The minutes of that meeting indicate that, following a discussion of the severe traffic problem which had developed on Lakeville Boad, a proposed amendment to the zoning map was recommended to the village trustees. A month or so later, this proposal became, in slightly modified form, ordinance No. 60.
Next, the following comment appears in the minutes: “ Mr. Klein informed the Board that by coincidence, this morning, an informal preliminary sketch was submitted to him by Mr. Fred Rudinger for the development of the area with a bowling alley and a supermarket or discount house. The Board gave no opinion on this informal sketch and no further action was considered necessary.” (Emphasis supplied.)
The reference to Mr. Rudinger’s visit as being “ by coincidence ” appears somewhat odd since no zoning amendments had been considered previously. It is significant that no consideration was given to other possible alternatives for alleviating the traffic problem.
Only after adopting this recommendation did the planning board vote to ask the board of trustees to retain a planning expert to review the village’s master plan. On July 5,1960 the trustees retained Mr. Hugh Pomeroy to make just such an investigation. Later that same day, the planning board and the trustees met in joint session, and it was agreed that a required public hearing *474 should be held promptly. On July 27, 1960 ordinance No. 60 became law following the holding of a public hearing two days earlier.
This history of ordinance No. 60 must immediately raise doubts whether this race to the statute books was in accord with sound zoning principles or was a subversion of them for the process by which a zoning revision is carried out is important in determining the validity of. the particular action taken. The village argues that there was no longer any need for shopping facilities in the area. Assuming that to be so, this does not explain why consideration was only given to zoning the area as “ Residence C ”. A fair respect for the community’s need for taxables, as set forth in its “ developmental policy ”, required that some thought be given to other possible land use controls.
A more substantial justification for the rezoning was the serious traffic conditions on Lakeville Road. However, at the trial, the village’s own expert, Mr. Frederick P. Clark, who was retained by the village after Mr. Pomeroy’s death, admitted that business use of the east parcel would create less of a traffic problem than business use of the west parcel would. The reason for this was that access to the east parcel could be restricted to Northern Boulevard, while access to the west parcel would probably have to be from Lakeville Road.
The point here is not only that the expert’s argument does not support the village’s position, but that his testimony also conflicted sharply with the community’s “developmental policy” and his own earlier recommendations for modifications of that policy, which he had made in 1962 when he drafted a proposed ‘ ‘ Comprehensive Zoning Plan ’ ’ for the community.
In that report, Mr. Clark had recommended the rezoning of various perimeter areas in the community for commercial and light manufacturing use to take account of property developments outside the community and to strengthen the tax base. For example, he suggested that the entire area of the community south of the Northern State Parkway be rezoned for commercial or light manufacturing. On cross-examination, Mr. Clark admitted that the east parcel was in a perimeter area. The fair implication, therefore, is that commercial use of this property would conform with his recommendations for land use control.
*475 More pertinent is Mr. Clark’s testimony at the trial: “ In my opinion the property on the east side, the Andre property, could be used either for residential purposes as presently zoned or for business. I do not find in my study of it a marked superiority of one over the other. I believe it could be used for either as an appropriate use.”
He later modified this statement to include the proviso that there should be no access from Lakeville Road. This concession by Mr. Clark was no mistake. In light of the recommendations of his “ Comprehensive Zoning Plan of 1962 ”, he had to agree that commercial use was at least equally desirable. Otherwise, he would have discredited his own planning work for the community. Mr. Clark’s testimony establishes that the zoning amendment was neither in 1960 nor afterwards in harmony with the community’s over-all land use plan.
Aside from this testimony, examining the zoning map, one would find it difficult to locate a more fitting area to use for commercial purposes than this isolated neck near Northern Boulevard of which the subject parcel is part.
Viewing the village’s plans on a temporal basis, there is a consistency predating ordinance No. 60 and post-dating the change. In 1958 a large area in the northeast section of the village had been zoned for nonresidential use. After 1960 other changes of a similar nature were recommended in conformity with a policy of expanding areas of noncommercial use on the periphery of the community. The only significant deviation was the ordinance No. 60.
It is not disputed that the village officials faced a traffic problem in the Northern Boulevard-Lakeville Road area. Nevertheless, we can come to no other conclusion that the rezoning was not “ accomplished in a proper, careful and reasonable manner ” (Rodgers v. Village of Tarrytown, 302 N. Y. 115, 122, supra). Ordinance No. 60 not only did not conform to the village’s general “ developmental policy”, but it was also inconsistent with what had been the fundamental rationale of the village’s zoning law and map. The amendment was not the result of a deliberate change in community policy and was enacted without sufficient forethought or planning.. The particular conditions existing in the area did not support the radical change, which ordinance No. 60 embodied.
*476 More than 60% of the value, of appellant’s property, or $260,000,* was wiped out because, to use the words of the village’s first expert, “ in his discussions he had found it is the feeling of the Village that it does not want extensive business in that area”. (Emphasis supplied.)
These vague desires of a segment of the public were not a proper reason to interfere with the appellant’s right to use his property in a manner which for some 20 odd years was considered perfectly proper. If there is to be any justification for this interference with appellant’s use of his property, it must be found in the needs and goals of the community as articulated in a rational statement of land use control policies known as the “ comprehensive plan ”. We find that appellant has demonstrated that ordinance No. 60 did not conform to the established “ comprehensive plan ” of the village. Hence, ordinance No. 60 must be held to be ultra vires as not meeting the requirement of section 177 of the Village Law that zoning be “ in accordance with a comprehensive plan ”.
Turning then to the other claims of the appellant, we have also concluded that his claim of discrimination is equally valid.
Discrimination in zoning is usually thought of in terms of the injustice done to the landowner. In reality, it is also a wrong done to the community’s land use control scheme. It is the opposite side of the coin, one side of which is “ spot zoning ”.
Nevertheless, a claim of discrimination is not just another way of saying that the change does not accord with the comprehensive plan. When the claim is one of discrimination, the focus of inquiry is narrower. The issue is the propriety of the treatment of the subject parcel as compared to neighboring properties.
Trial Term found the rezoning here to be discriminatory because the rezoning did not affect the retail service area to the south on Lakeville Road. The court pointed out that, while those properties would of course be entitled to an exemption for existing nonconforming uses, there was nothing to differentiate that parcel from the appellant’s west parcel, and the failure to include *477 the existing retail area evidenced a discriminatory pattern of treatment. It also found that the “ ordinance as enacted discriminated against the east parcel ” for the same reason that it discriminated against the west parcel, but also because, unlike the west parcel, most of the east parcel was already being used as a restaurant, that is for a nonconforming commercial use. Nevertheless, there was a “ sufficient difference ” between the two parcels to warrant their being treated differently (40 Misc 2d 265, 272).
The difference was the fact that the east parcel could be used for residential purposes, where the west parcel could not be. A property owner need not prove confiscation to establish discrimination. In almost every respect, the properties are alike. Also, on the north, west and southwest of the east parcel, the adjacent properties are now zoned for business use.
While not decisive, there is also the added factor that there is at present a nonconforming commercial use on part of the property, which is likely to persist. The treatment accorded the east parcel must take account of economic realities.
There is an inconsistency in the argument of the Trial Justice that there was nothing in the “ surrounding residential uses * * * nor any other circumstances ’ ’ to distinguish the retail service area from both the west and east parcels, and, on the other hand, that the east and west parcels were somehow different (40 Misc 2d 265, 272).
■ In any event, reversal is clearly warranted by the subsequent history of this case. The village might have met the Trial Justice’s objection, had it rezoned the Lakeville Road retail area to Residence “ C ”. Instead, contingent upon the Appellate Division’s sustaining the finding of invalidity, the village rezoned the west parcel into a new category Business “ G ” which permits allegedly non-traffic-creating business use, i.e., laboratories and office and public buildings. Subsequently, the village withdrew its appeal. As Justice Hopkins correctly pointed out, the village thus accepted the finding of invalidity. That being. so, it removes all doubt that the treatment of the east parcel is discriminatory.
Having recognized that the west parcel could not fairly be zoned for residential use, the village was bound to show that dissimilar treatment of the east parcel was still warranted. The *478 village offers no acceptable reason to justify the distinction and, as noted above, the position of the village’s expert was, if anything, that the east parcel could properly be zoned for nonresidential use, but the west parcel should be restricted to residential use. That crucial concession removed any basis for an argument that the needs of the village required a different treatment of the east parcel from that of the west parcel.
Appellant has amply demonstrated that ordinance No. 60 constitutes unjustifiable discrimination. If we also consider the fact that, aside from the lack of any showing of purpose in distinguishing the two parcels, the substantial loss which appellant will sustain if the zoning change is upheld, the invalidity of the ordinance becomes unquestionably clear (Stevens v. Town of Huntington, 20 N Y 2d 352; see, also, Mary Chess, Inc. v. City of Glen Cove, 18 N Y 2d 205, 209-211).
The order of the Appellate Division should be reversed and the judgment of the Supreme Court should be modified by striking out the first decretal paragraph and by substituting in place thereof a decretal paragraph declaring ordinance No. 60 to be ultra vires, unconstitutional and void as to the property of plaintiff located on the easterly side of Lakeville Road and the westerly side of Summer Avenue, with costs.
Chief Judge Fuld and Judges Burke, Scileppi, Bergan, Breitel and Jasen concur.
Order reversed, with costs in all courts, and case remitted to' Supreme Court, Nassau County, for further proceedings in accordance with the opinion herein.

Mr. Erskine, the village’s expert, gave as the value of that portion of east parcel still in a Business “ A ” classification as $3.50 per square foot and the value of the property rezoned for Residence “ C ” as $1 per square foot. This is a 71.4% reduction in value, and the expert conceded that no consideration had been given to preparing the lots for construction.