opinion of the court
Ernst H. .Rosenberger, J.
Petitioner, in this CPLR article 78 proceeding, seeks to annul the determination of the respondents to include in the Upper East Side Historic District property purchased by the petitioner in November, 1980, with the express intention of commercial redevelopment.
The property, at 14 East 60th Street, contains a 12-story building, constructed in 1902, to which a wing was added in 1905, designed by the same architect. Since 1969, the building has been utilized as an office building. One of the tenants is the Copacabana nightclub, which occupies the ground floor.
Petitioner contends that the designation of the building, on the southern boundary of the historic district was arbitrary, unreasonable and not in accord with a “well consid *567 ered plan;” that the City Planning Commission’s report to the Board of Estimate was inadequate; and that petitioner’s building does not belong to the distinct section of the city which was designated as the historic district. Thus, that it was, “affected by an error of law.”
Respondents’ position is that the building is properly designated as within the historic district; that the designation was fully in accord with a proper landmarks preservation plan; and that the City Planning Commission’s report to the Board of Estimate and the board’s subsequent approval of the designation were entirely appropriate and correct.
Prior to petitioner’s purchase, the Landmark Preservation Commission (hereinafter LPC) held a public hearing, on June 19, 1979, concerning the proposed designation of the historic district. Notice of the hearing was published in the City Record, pursuant to section 207-12.0 of the New York City Administrative Code, and written notice was given to property owners, including petitioner’s predecessor. Petitioner’s predecessor did not appear at the hearing, nor did it file written objections to the designation proposal. Community Board No. 8 also held a public hearing, in September of 1979, and voted 27-3 to recommend to the LPC that the historic district be designated as proposed. The plan for a historic district was also publicized in the media, e.g., New York Times’ articles of April 21,1980 and May 4, 1980.
After those hearings and upon further study, the LPC revised the boundary lines of the district. On May 19,1981, LPC voted to designate the historic district. According to the respondents, a designation report included a description of every building in the historic district. This report was filed by the LPC, with the secretary of the Board of Estimate and with the City Planning Commission (hereinafter CPC). On June 11, 1981, the matter of the historic district designation was referred to the CPC by the Board of Estimate, requesting a report from CPC to the board.
Shortly thereafter, petitioner protested inclusion of its building in the historic district and submitted two reports to the CPC. One, the Shopsin report, states in substance *568 that the building lacks architectural distinction. The other, the Felt report, estimates that by restricting development of the petitioner’s building, the city would be losing more than one million dollars in tax revenue and approximately 300 new jobs.
The CPC, in a report dated July 13,1981, concluded that the historic district would not interfere with zoning and plans for renewal of the area. CPC described recommended zoning changes to downzone the area, including petitioner’s building.
Petitioner sent to each member of the Board of Estimate copies of the Shopsin report and the Felt report with a letter of protest on July 24, 1981.
The Board of Estimate held a public hearing on September 10, 1981. Again petitioner objected to the inclusion of its building in the historic district. On September 24,1981, the Board of Estimate approved the historic district as designated, without any alteration of the boundary lines.
Authority for designation of historic districts is contained in the Landmark Preservation Act. (Administrative Code, ch 8-A, § 205-1.0 et seq.) After public hearings the LPC may designate as a historic district,
“Any area which:
“(1) contains improvements which:
“(a) have a special character or special historical or aesthetic interest or value; and
“(b) represent one or more periods or styles of architecture typical of one or more eras in the history of the city; and
“(c) cause such area, by reason of such factors, to constitute a distinct section of the city;
“(2) has been designated as a historic district pursuant to the provisions of this chapter.” (Administrative Code, § 207-1.0, subd h.)
Owners of property so designated are precluded from altering facades or creating additional “bulk” without application to, and prior consent of, the LPC and the CPC. Interior gutting, restoration, or rehabilitation of existing buildings also requires prior approval from the staff of *569 LPC. Within a historic district, certain buildings, designated as having “no style,” are entitled to expedited approval for demolition or alteration. There is also a procedure in the Landmark Preservation Act for relief for owners of buildings for which an insufficient monetary return can be established.
Petitioner contends that CPC did not address the zoning regulation which applies to its property. The highrise, commercial zone, of which petitioner’s building is a part, extends one block beyond petitioner’s street north to 61st Street. Petitioner points out that its property is surrounded by high-rise buildings and that its designation on the boundary of the historic district separates it from the area to which it belongs as a matter of zoning, actual use, and geography; that the proposed downzoning also includes petitioner’s building as part of the midtown rather than the upper east side; and that 60th Street is a major crosstown artery, for crosstown buses, for traffic crossing Central Park, and with a BMT subway entrance.
The CPC report to the Board of Estimate speaks of “tension” between zoning and preservation, as follows:
“The historic designation of developed, low-scale areas where zoning permitted high-rise development created tension between the preservation objective of the landmarks policy and the development objectives of the zoning policy. The Planning Commission, recognizing that this tension could subvert preservation, created the zoning tool of height limitation within historic districts and has applied it in Brooklyn Heights and Gramercy Park.
“In order to ensure compatible development, the Planning Department prepared, and the Commission reviewed, a range of zoning controls and landmark protection strategies. Of the alternatives recommended by the Department, designation of only individual landmark-quality buildings (without a district) was considered impractical by the Landmarks Commission because of the large number (474) of separate designation actions that would be required. The high proportion (45%) of the total number of buildings, and their even distribution throughout the area, suggested district designation.
*570 “Exclusion of Madison and Lexington Avenues from the historic district was considered. Since Madison Avenue includes a number of landmark-quality buildings and others that contribute to the scale and character of the district as a whole, the boundaries for excluding Madison were difficult to draw and defend. In the broadest sense, Madison is part of the surrounding district.
“Lexington Avenue as a totality is not included in the district. Only a few frontages along Lexington similar in character to the rest of the district are included.
“Madison Avenue’s commercial character developed to its present attractiveness in a period of little new construction during which the major activity was adaptive re-use of the existing stock. The frequent remodelling of shopfronts that is essential to the commercial vitality of Madison Avenue and that has produced a varied and lively array of shopfronts will be facilitated by a procedure developed by the Landmarks Commission to expedite this process.”
The Board of Estimate approval was based upon this CPC report, which did address the zoning issue. Moreover, each member of the board had the benefit of the Shopsin report and the Felt report bringing to attention the specific situation of petitioner’s building.
Cases considering the requirement of a comprehensive plan do not demand more than apparently occurred in the designation of the Upper East Side Historic District. The cases hold that alternatives must be considered; that planning must be based upon more than a “feeling”; that transitional areas or buildings may be used to protect certain areas; and that comprehensive plans may be changed. (Randolph v Town of Brookhaven, 37 NY2d 544; Matter of Town of Bedford v Village of Mount Kisco, 33 NY2d 178; Udell v Haas, 21 NY2d 463, 469-470; Matter of Society for Ethical Culture in City of N. Y. v Spatt, 68 AD2d 112, affd 51 NY2d 449; cf. Hale v City of Utica, 61 AD2d 885.)
Petitioner maintains that a statutory requirement, that zoning regulations be exercised “in accord with a well considered plan” (General City Law, § 20, subd 25), applies to designations by the LPC such as this one. In support of *571 its position, petitioner cites the Randolph and Udell cases (supra), and Penn Cent. Transp. Co. v New York City (438 US 104). In Penn Cent., the Supreme Court of the United States discussed New York’s Landmark Preservation Act, in application as a governmental land use decision, holding that no taking had been effected when the statute was applied to Grand Central Terminal. The court indicated in dictum (p 133, n 29), that the judicial inquiry, on a property owner’s challenge of the application of a zoning ordinance, is a similar inquiry to a challenge of a landmark designation or restriction. New York’s Court of Appeals, in the Randolph and Udell cases (supra), discussed zoning (not landmarks) regulations with respect to their required conformance to a “comprehensive” plan. A “ ‘well-considered plan’ ” is referred to in Udell (21 NY2d, supra, at p 469), only to the extent of measuring whether the exercise of governmental power was “arbitrary” or “rational” or “reasonable.” These cases, therefore, do not apply the “well considered plan” standard, of subdivision 25 of section 20 of the General City Law to a landmarks or historic district designation, nor do the cases define “well considered plan” beyond the degree of reasonableness which is required for a governmental determination on an article 78 challenge, such as the present one.
Respondents’ argument, that landmarks designations need not be in accord with a “well considered zoning plan,” has greater support. Section 96-a of the General Municipal Law, the enabling act for the LPC, is an entirely separate statute from the zoning statute cited by petitioner. The phrase “well considered plan” is not present in the language of the landmarks statute. Section 207-2.0 of the New York City Administrative Code provides for a process of decision in which CPC must report on the impact of proposed LPC designations on zoning, and in which the Board of Estimate is the body with the responsibility of voting into effect such a designation. This separation of agencies, purposes, and functions was discussed by the Court of Appeals in Penn Cent. Transp. Co. v City of New York (42 NY2d 324, 329-330), indicating that LPC designations may indeed conflict with zoning plans. However, the Court of Appeals continued (p 330), that a reasonable basis *572 (“acceptable reason”, “acceptable purpose”) for such a conflicting designation must be present.
The architectural characteristics of the building are disputed by the parties. Petitioner refers to the building as one of little note, designed by Raleigh C. Gildersleeve, an architect who:
“was not among the dozens of architects and firms which the Commission singled out for distinction in its Designation Report for the District, nor have his buildings ever been recognized in the architectural literature on New York, nor is petitioner’s building mentioned in the American Institute of Architects Guide. Further, the Commission paid little attention to petitioner’s building in its Designation Report, while lavishly praising the historical and architectural merits of the other two buildings on 60th Street (the Harmonie Club and Metropolitan Club) which were included in the District.
“To suggest that such a little noted building is of an aesthetic character and historical importance worthy of designation as a New York City landmark would, it seems to us, cheapen the concept of City landmarks.”
However, the respondents state, in substance, that the boundaries of the Upper East Side Historic District were drawn after an assessment was made of the architectural quality of each building and its relation to the other buildings in the district; that petitioner’s building displays, on a small scale, the Beaux Arts elements used on nearby townhouses; and that petitioner’s building therefore serves as an effective transition between the low-scale townhouses of the district and the large-scale apartments and hotels on the avenues.
It is well settled that a court may not substitute its judgment for that of the administrative body of experts responsible for making a determination, unless it is made without a rational basis. (Matter of Society for Ethical Culture in City of N. Y. v Spatt, supra.) The CPC and the Board of Estimate did consider the relationship of the historic district designation to the zoning. As a matter of law, this consideration, together with the assessment of each building, and the transitional function of petitioner’s *573 building, provides a reasonable basis for its inclusion in the district.
Accordingly, petitioner’s application is denied and the petition is dismissed.