Tamara Wahl **GREEN**, et al., **Plaintiffs,**

v.

**COUNTY COUNCIL OF SUSSEX COUNTY and Randall A. Godwin, et al., Defendants.**

Court of Chancery of Delaware, Sussex County.

Submitted: Dec. 20, 1985.

Decided: March 19, 1986.

Karl Haller of Haller & Hudson, Georgetown, and William S. Green, Bethesda, for plaintiffs.

A. Dean Betts of Betts & Schrader, Georgetown, for County Council of Sussex County.

Merritt Burke, III of Brown, Shiels & Chasanov, Georgetown, for defendant Godwin.

## OPINION

ALLEN, Chancellor.

This action challenges the validity of an ordinance adopted by the Sussex County Council changing the zoning classification of a 1.5 acre tract located in Baltimore Hundred from M–R (medium density residential) to C–1 (general commercial). Plaintiffs are individuals who own interests in land in the immediate vicinity of the rezoned parcel. Defendants are the owner of that parcel and the members of the Sussex County Council. Pending is plaintiffs' motion for summary judgment.

Four grounds are advanced in support of the relief sought. First it is claimed that the statutory requirement of public notice of the hearing at which the proposed zoning amendment was considered, was not satisfied in this instance. Secondly, it is contended that the ordinance attacked is not consistent with the adopted comprehensive land plan for Sussex County and is thus invalid. Thirdly, it is urged that the rezoning constituted impermissible spot zoning and lastly, that the adoption of the rezoning ordinance was arbitrary and capricious and thus, under established law, invalid.

For the reasons that follow I have concluded that the rezoning of the parcel in question to a C–1 status is inconsistent with the comprehensive development plan

adopted by County Council at the direction of the General Assembly. Since I conclude that the statutes that confer upon the County Council the power to regulate land use in the county through zoning also limit that power so that rezonings may only be granted when they are in conformity with the overall comprehensive land plan, I am forced to conclude that in granting the rezoning sought Council exceeded its delegated power. As a consequence, the ordinance is of no legal effect. So holding, I have no occasion to address the alternative theories pressed by plaintiffs to support the granting of the relief they seek.

## I.

Before turning to a discussion of the substance of the claims asserted, I note the limited role of this Court in a proceeding of this kind. The regulation of land use is one aspect of the general power of the State government to legislate with respect to the public health, safety and general welfare. Whenever such power is duly exercised, it is no part of the duty of a court to substitute its own judgment concerning what action, in the circumstances, would best promote the public welfare. *Tate v. Miles,* Del.Supr., 503 A.2d 187 (1986). Rather, the role of a court when required to review a zoning classification is generally limited to determining whether applicable standards imposed by the state and federal constitutions have been satisfied and, in the case of county or municipal ordinances, whether all applicable statutory provisions have been met.

When, as in this instance, no allegation of uncompensated taking is involved, this review can generally be expected to involve at least one of three possible inquiries: First, does the record establish any basis for the reviewing court to affirm a presumption that the county government's action was rationally related to the achievement of the purposes for which the delegation was made by the General Assembly;[1] secondly, have the procedural prerequisites for exercise of the delegated power been satisfied;[2] and thirdly, is the zoning ordinance challenged "in accordance with the approved comprehensive development plan" previously adopted by the county government. *See,* 9 *Del.C.* § 6904(a).

As indicated above, while arguments directed to all three levels of review are pressed in this case, the dispositive issue, in my opinion, relates to the mandate of the General Assembly that zoning regulations fit within and comply with the provisions of the adopted comprehensive development plan for the county. Thus, I turn immediately to a discussion of that issue.

---

**1.** Those purposes are set forth in Section 6904 of Title 9 which provides in relevant part as follows:

(a) Regulations adopted by the county government ... shall be designated and adopted for the purpose of promoting the health, safety, morale, convenience, order, prosperity or welfare of the present and future inhabitants of Sussex County, including, amongst other things, the lessening of congestion in the streets or roads or reducing the waste of excessive amounts of roads, securing safety from fire, flood, and other dangers, providing adequate light and air, preventing on the one hand excessive concentration of population and on the other hand excessive and wasteful scattering of population or settlement, promoting such distribution of population and such classification of land uses and distribution of land development and utilization as will tend to facilitate and provide adequate provisions for public requirements, transportation, water flowage, water supply, water and air pollution abatement, drainage, sanitation, educational opportunities, recreation, soil fertility, food supply, protection of the tax base, securing economy in governmental expenditures, fostering the State's agricultural and other industries, and the protection of both urban and nonurban development.

**2.** Those procedural requisites require, at a minimum, that a public hearing on the advisability of the zoning regulation be held *(see,* 9 *Del.C.* § 6910; § 6911), that due notice of such hearing be publicly promulgated *(see, Carl M. Freeman Associates, Inc. v. Green,* Del.Supr., 447 A.2d 1179 (1982)) and that sufficient findings be made by the county government to permit judicial review of the action taken *(see, Tate v. Miles,* Del.Supr., 503 A.2d 187 (1986)).

## II.

The 1.5 acre parcel affected by the rezoning here in issue lies along the eastern border of Route 1, a major north-south artery, just west of the Atlantic Ocean and south of the southern border of the Delaware State Seashore Park at Indian River Inlet. The property consists of ten lots, seven or eight of which are vacant and the remainder of which are occupied by a motel, liquor store and convenience store (T-106).[3] These commercial establishments are operated in a structure which is a non-conforming use, having been in existence prior to the enactment of zoning regulation in the county. There are a few other pre-existing structures used for commercial purposes in the immediate vicinity (T-108, 114). With one further exception located approximately a mile to the south, the remaining land between Indian River Inlet to the north and the town of Bethany Beach three miles to the south is used entirely for residential purposes or is undeveloped. Prior to the grant of C-1 status to the 1.5 acre tract involved in this litigation, the entire coastal area stretching from Dewey Beach south to the town of Bethany Beach was zoned exclusively for residential uses. (T-146).

Mr. Godwin, the landowner, had previously attempted without success to have the parcel involved rezoned. On this successful attempt, the principal thrust of applicant's argument was that there was a need or demand for additional commercial space at this location (T-111); that the rezoning sought was, because of the existence of certain restrictive covenants burdening the land in question, only the first step in developing that property commercially (T-189-191);[4] and that Mr. Godwin had purchased this property before zoning regulations were put in place and, at the time, it was designated on the subdivision plan by the private developer of the lots for commercial use. (T-107). At neither the Planning Commission hearing nor the County Council hearing did Mr. Godwin proffer substantive testimony or argument designed to meet the assertion made at those hearings by objectors that the proposed zoning was inconsistent with the county's comprehensive land plan.

Following its hearing, the Planning and Zoning Commission recommended to the County Council that the rezoning be granted. The basis for that recommendation was orally stated at the Council hearing:

Planning and Zoning Commission did hold their Public Hearing and have made a recommendation for approval based on the fact that at the Hearing there was evidence brought [sic] that six of the lots are now developed for commercial use, and they have been used for many years as a commercial use, and that they felt that the most appropriate use for the four vacant lots would be some kind of commercial facility because of the size of the lots, that commercial facility would be limited. (T-047).[5]

Following its hearing County Council adopted Ordinance 108 granting the rezoning sought. The recitals contained in that ordinance comprise all of the findings of

3. Reference is made to the transcript of the hearing before County Council which has been placed in the record of this proceeding. The record is in some conflict as to how many of the 10 lots that make up the 1.5 acre parcel involved are, or were at the time of the rezoning, undeveloped. The most complete testimony on the point was given by Mr. Godwin himself to the effect that of the 10 lots involved (see, Ordinance 108, Section 1), 7 are presently undeveloped (see, T-058-059). At another point Mr. Godwin testified that 8 of the lots were vacant (see, T-106). In recommending the granting of the rezoning, the Planning and Zoning Commission reported to the County Council that 4 of the 10 lots were undeveloped (T-047).

4. Applicant placed repeated emphasis at the various hearings upon the existence of the restrictive covenants that apparently have the effect of subjecting commercial development on these lots to the vote of a civic association (the membership of which, however, is not apparently open to all residents of the affected areas).

5. But as to how many of the 10 lots involved are commercially developed see note 3, p. 885, supra.

the Council. With respect to the claim pressed by those opposing the rezoning that to grant it would be inconsistent with the Sussex County comprehensive development plan, the Council found:

Whereas, the County Council of Sussex County has determined that said change of zone is in accordance with the Comprehensive Development Plan and promotes the health, safety, morals, convenience, order, prosperity and welfare of the present and future inhabitants of Sussex County, . . .

No elaboration beyond this statement was provided by the county government as to the basis for its conclusion.[6]

Judicial review of the finding that the proposed rezoning would be "in accordance with the Comprehensive Development Plan" requires a careful assessment of the terms of the adopted plan, a task to which I now turn.

### III.

The basic comprehensive development plan for Sussex County was prepared in 1970; with respect to the specific area in question, that plan was supplemented with a 1976 plan denominated The South Coastal Zone Land Use Plan.[7]

*The 1970 County-wide Plan*

The comprehensive development plan is not a precise delineation of appropriate land uses. It is a general statement of policies, objectives and standards and a projection of appropriate patterns of future development. Its separate elements include a land use plan, a transportation plan, an open space plan, a housing plan, and a facilities plan. We are here concerned with the land use plan and most particularly with that portion of the plan that treats commercial land use.

The 1970 Plan's concept of appropriate commercial land use contemplates several levels or classifications of such use: general commercial, planned community commercial centers, and highway commercial. (1970 Plan p. 13).[8] The comprehensive development plan identifies these levels of commercial development and their role in the plan as follows:

The term "general commercial" refers to in-town or downtown commercial centers. The plan encourages general commercial development in cities and towns *in support of planned goals of strengthening communities and clustering commercial development.* Planning for in-town commercial development is the proper concern of local (city and town) officials.

Planned community commercial centers are built around a supermarket with a market radius of 10 to 15 minutes driving time, and serving 5,000 to 40,000 people. Convenience goods and services are the primary function. *Acreage requirements vary from 4 to 10 acres.* Each center should have easy access to major highways, *a carefully planned site layout with adequate setback, screening, and off-street parking,* and controlled access to highways.

Highway commercial serves the motoring public and is found along major highways; it includes gasoline stations, other auto services, restaurants and drive-in

---

6. The failure of the County Council to state any basis for the critical finding quoted above, might provide a basis itself to grant the relief sought. *Compare, Tate v. Miles,* Del.Supr., 503 A.2d 187 (1986) (failure of county government to provide a record from which a reviewing court could determine if there was any basis whatsoever for council's determination fatally flawed the zoning ordinance there in issue) *with Sussex County Environmental Concerns Association, Inc., v. Rehoboth Mall Limited Partnership,* Del.Ch., C.A. No. 1101–S, Berger, V.C. (March 20, 1985) (where "the reasons for the Council's

decision [are] obvious from the record. . . . [T]he Council's decision may be upheld even where no reasons are given.").

7. *See,* January 6, 1970 Minutes of Sussex County Levy Court; June 29, 1976 Minutes of Sussex County Council.

8. A fourth level of use "neighborhood commercial uses" is not classified and not included in the plan. That classification is said to be properly a concern of municipal planning officials.

eating places, drive-in theatres, motels, and trailer sales and auto sales lots.

*The haphazard array of strip commercial development along some highways* causes serious traffic conflicts and *damages the visual qualities of the roadside and neighboring residential communities* due to excessive and garish advertising signs, inadequate setbacks, inadequate screening, and uncontrolled access to the highway. (1970 Plan at p. 13).[9]

The 1970 Plan identifies four existing community commercial centers (one such center being located in Milford, one in Seaford and two in Rehoboth Beach) and proposes the creation of three new community commercial centers to be located near Laurel, Dagsboro and Georgetown. (See Fig. 4, 1970 Plan at p. 14).

Highway commercial development at controlled locations is shown on the plan at six locations in the county: at Five Points, west of Lewes; on Route 113 near Dagsboro; on Route 13 at Laurel, at Bridgeville, and at Greenwood; and, finally, on Route 113, north of Georgetown.

Apart from its statements concerning classification and general location of commercial uses, the 1970 Plan contains the following four overall policy guides to commercial land use:

1. Planned shopping centers providing adequate off-street parking and safe, convenient access to highways shall be encouraged.

2. Strip commercial development scattered along major highways and interfering with safe, efficient movement of traffic shall be discouraged.

3. Commercial development shall be convenient to population centers but located to avoid conflict with residential values and amenities.

4. Existing in-town commercial areas should be strengthened whenever possible.... (1970 Plan p. 12.)

9. Emphasis added throughout unless otherwise noted.

The 1970 Plan does not contemplate, within the unincorporated areas of Sussex County that it treats, any planned community commercial centers along the ocean south of Indian River Inlet, the area treated by the more specific 1976 Plan. (*See* 1970 Plan, p. 9, Fig. 2). The comprehensive development plan identifies that entire section of coastal land (outside of incorporated areas) as best suited for residential uses. In conformity with that designation, the land here involved and the land throughout its vicinity has been zoned exclusively for residential uses apparently since the adoption of the original zoning regulations until the rezoning challenged in this action.

*The 1976 South Coastal Zone Plan*

In 1976 the County Planning and Zoning Commission had a more detailed land use plan prepared for the extreme southeastern corner of the county. The area covered by the 1976 Plan extends north from the state line to the Indian River Inlet and west from the ocean to a point east of Frankford. For planning purposes the 1976 Plan divided the area it treated into five sub-areas which it proposed be developed along a village concept:

The population of the villages would range from approximately 30,000 to 55,000 people. Based upon this concept, the need for commercial facilities, schools, recreation and public facilities was evaluated. Each of the five villages would support a community-type shopping center. It is anticipated that higher density development would take place in the vicinity adjacent to this shopping area. The location of these villages are shown on Plate IX.

\* \* \* \* \* \*

For each village, the development of a community shopping area in a central location is encouraged to reduce strip commercial zoning. These shopping centers, should have an area of 25 to 50 acres depending on the size and density of the area to be served. The centers

should be designed to serve the weekly shopping needs for the average family and would normally contain a supermarket, a drug store and other smaller businesses. Professional offices for doctors, lawyers, etc. could also be located within the complex. Although community shopping centers are encouraged, it is possible that the shopping needs can be served by several smaller centers located throughout the village.

Each neighborhood would contain a small commercial area for convenience shopping ranging in size from three to five acres. These centers would be designed to meet the daily shopping needs of the neighborhood residents and could be constructed as part of a recreational neighborhood-centered complex. Location of proposed shopping centers are shown schematically on the land use plan, however, they can be located in alternative areas if the developer can demonstrate valid reasons. (1976 Plan at pp. 52–55).

The 1.5 acre parcel involved in the rezoning here challenged exists in the extreme northeastern portion of an area that the 1976 plan designates as Village # 1. That area stretches from South Bethany northward to the Indian River Inlet and extends approximately a mile and a half inland from the ocean. *See*, 1976 Plan, p. 54. Within this area the 1976 Plan proposed that a centrally located village commercial area be situated north of Bethany Beach and approximately one mile inland. (See 1976 Plan, p. 48.) The 1976 Plan does not attempt even generally to fix appropriate locations for neighborhood commercial centers. (B–1 classifications, *see*, *infra*). The 1976 Plan continues to treat the area north of Bethany Beach running along the ocean as appropriately suited for residential development exclusively.

*The Sussex County Comprehensive Zoning Ordinance*

In implementing the comprehensive development plan for the county, the Sussex County Council adopted a comprehensive zoning ordinance. It establishes three zoning classifications for commercial uses: U.B. (urban business district), B–1 (neighborhood business district) and C–1 (general commercial district). The purpose of a B–1 district is stated in the comprehensive ordinance as follows:

The purpose of this district is to provide primarily for retail shopping and personal services uses, to be developed either as a unit or in individual parcels, to serve the needs of a relatively small area, primarily nearby rural, low-density or medium-density residential neighborhoods. To enhance the general character of the district and its compatibility with its residential surroundings, signs are limited to those accessory to businesses conducted on the premises and the number, area, and types of signs are limited.

The C–1 zone, to which the 1.5 acre parcel here involved was rezoned, is the most intensive commercial use contemplated by the Sussex County zoning regulations. Its purpose is set forth in those regulations as follows:

The purpose of this district is to provide sufficient space in appropriate locations for a wide variety of commercial and miscellaneous service activities, generally serving a wide area and located particularly along certain existing major thoroughfares where a general mixture of commercial and service activity now exists, but which uses are not characterized by extensive warehousing, frequent heavy trucking activity, open storage of materials or the nuisance factors of dust, odor, and noise associated with manufacturing.

The zoning regulations themselves do not give guidance as to what might constitute "sufficient space" in "appropriate locations" for C–1 treatment. It is to the comprehensive development plan itself that one must look to provide context for those terms.

IV.

Before attempting to evaluate plaintiff's claim that Council's determination that this

rezoning is in accordance with the Sussex County comprehensive development plan cannot be sustained, it will be helpful to sketch the legal context of that inquiry by focusing briefly upon the source and specificity of the statutory requirement that the Court must here construe.

■ The Sussex County government possesses no inherent power to regulate land use in the county. That power is one that resides in the General Assembly.[10] In 1967 the General Assembly enacted statutes, now codified as Chapter 68 and 69 of Title 9 of the Delaware Code, that, for the first time, created a County Planning and Zoning Commission of Sussex County, mandated the creation and adoption of a comprehensive development plan for the county, and conferred on the Levy Court of Sussex County the power to promulgate zoning regulations. *See*, 56 *Del. Laws* Chapters 95 and 97. That delegation, however, did not confer upon the county government the full authority possessed by the General Assembly to legislate on questions of land use.

Section 6902 of Title 9 conferred on the County government (originally the Levy Court) the power to regulate land use "in accordance with the conditions and procedure specified in this chapter". Section 6904(a) of that chapter specifically mandates:

"Regulations adopted by the county government, pursuant to the provisions of this chapter, *shall be in accordance with the approved comprehensive development plan* and shall be designated and adopted for the purpose of promoting the health, safety [etc.] ..."

The Planning Commission was directed to certify to the County government "a zoning proposal *based upon and in full accordance with* the adopted comprehensive development plan." 9 *Del.C.* § 6907(a). County government was granted the power

to "make amendments, [and] supplements [in the zoning regulations] ... in accordance with the comprehensive development plan ..." 9 *Del.C.* § 6911(a).

■ Thus, the statute conferring the power on County Council to regulate land use in the county makes plain that that power may only be exercised to adopt or amend regulations that are in accordance with the "approved" (§ 6904), "adopted" (§ 6907) comprehensive development plan.

■ In construing the requirement that in enacting zoning regulations, County Council do so only "in accordance with the approved comprehensive development plan" it is helpful to note the distinction between this statutory requirement and the quite different requirement construed by many of the reported cases that zoning regulations be in accordance with *a* comprehensive plan.[11] The latter requirement derives in part at least from the constitutional obligation that the police power not be exercised arbitrarily. Any regulation that discriminates, as zoning regulations inevitably do, must, in order to satisfy the equal protection clause of the federal constitution, be ascribable to or consistent with some rational plan or purpose. It is this requirement that is violated when a zoning regulation is struck down as impermissible "spot zoning". *Reinbacher v. Conly*, Del.Ch., 141 A.2d 453, 457 (1958).

■ The comprehensive plan with which zoning regulations must be in accordance, in order to satisfy the requirement of nonarbitrary action, does not necessarily refer to a written document or series of written documents distinct from the zoning ordinance. Instead, the plan may be discerned from a review of the regulatory language itself. *See, McQuail v. Shell Oil Company*, Del.Supr., 183 A.2d 572 (1962); *Udell v. Haas*, N.Y.App., 21 N.Y.2d 463, 288 N.Y. S.2d 888, 235 N.E.2d 897 (1968); and cases

10. *See,* Del.Const., Art. II, Sec. 25.

11. *See, e.g., Montgomery v. Bremer County Board of Supervisors*, Iowa Supr., 299 N.W.2d 687, 695 (1980); *Bernard v. City of Bedford,*

Tex.Civ.App., 593 S.W.2d 809, 812 (1980); *McBride v. Town of Forestburgh*, 54 App.Div.2d 396, 388 N.Y.S.2d 940, 942 (1976).

cited by 1 Yokley, *Zoning Law and Practice*, § 5–3 at 219 n. 14 (1978).

In Delaware, zoning regulations adopted pursuant to the delegation of power contained in Chapter 69 of Title 9 must, of course, be in accordance with a comprehensive plan in this sense. They must be ascribable to some rational scheme that seeks to achieve the public welfare. But unlike the statutes in some states,[12] the legislative scheme envisioned by Chapters 68 and 69 of Title 9 contemplates the formal adoption of a particular comprehensive development plan. Zoning regulations thereafter adopted must not only be non-arbitrary in the sense that they must be ascribable to some rational pursuit of the public welfare ("*a* comprehensive plan") but they must be consistent with or in accordance with the particular scheme portrayed in the adopted comprehensive development plan.

This distinction, which is an important one if one is to rationalize the myriad cases in other jurisdictions dealing with the requirement of consistency with a comprehensive plan,[13] is also essential to place in its proper context our Supreme Court's holding in *McQuail v. Shell Oil Company*, Del.Supr., 183 A.2d 572 (1962) which is relied upon by defendants. There our Supreme Court stated that "[t]he requirement that there be a plan is satisfied if the change of zoning classification bears some reasonable relation to the scheme of zoning adopted in the basic zoning code." 183 A.2d at 578. Defendants argue that this standard is satisfied here and thus the

amendment attacked is in accordance with a comprehensive plan.

A review of *McQuail*, however, shows that case deals with statutory provisions requiring in essence that zoning be in accordance with a plan in the first sense described above (i.e., non-arbitrary action), not with a statute such as the one I am here constrained to interpret, that requires conformity with the particular previously adopted plan. *Compare*, 9 *Del.C.* §§ 2602, 2603(a) (1953) *with* 9 *Del.C.* § 6904(a) (1975). The distinction is critical and renders *McQuail* inapposite here. *See generally*, Haar, *"In Accordance with a Comprehensive Plan"*, 68 Harv.L.Rev. 1154 (1955).

## V.

I turn finally to the dispositive question. That critical inquiry is whether Council's determination that its ordinance is in accordance with the approved comprehensive development plan may be sustained. I regard that finding as essentially a conclusion of fact, judicial review of which is to be made on the basis of the record developed before County Council. *Town of Bethany Beach v. County Planning and Zoning Commission*, Del.Ch., C.A. No. 642, Hartnett, V.C. (October 10, 1980). Because that finding is deserving of appropriate deference, *Willdel Realty, Inc. v. New Castle County*, Del.Supr., 281 A.2d 612, 614 (1971), if, after reviewing that record and the substance of the adopted plan itself, there is substantial evidence support-

---

12. *See, e.g.*, N.Y. Town Law § 263 (McKinney 1986 Supp.); Tex.Rev.Civ.Stat.Ann. art. 1011c (Vernon 1963); Iowa Code § 358A.5 (1983). The Standard State Zoning Enabling Act (United States Department of Commerce) which was promulgated in 1926 first contained a requirement that zoning regulations be in accordance with a comprehensive plan. That statute was the model for many state zoning statutes and thus the requirement of conformity with some comprehensive plan is found in many state statutory schemes governing zoning.

13. *Compare, e.g., Citizens Ass'n. of Georgetown, Inc. v. Zoning Comm'n.*, 477 F.2d 402 (D.C.Cir.

1973) *with City of Cape Canaveral v. Mosher*, Fla.Dist.Ct.App., 467 So.2d 468 (1985). One comment written in 1975, noted that "... a majority of American jurisdictions have not accepted the idea that a separate planning process is implicit in the concept of zoning in accord with a plan." Sullivan & Kressel, *Twenty Years After—Renewed Significance of the Comprehensive Plan Requirement*, 9 Urban L.Ann. 33, 40 (1975). *See generally*, Haar, *"In Accordance with a Comprehensive Plan"*, 68 Harv.L.Rev. 1154 (1955); Mandelher, *The Role of the Local Comprehensive Plan in Land Use Regulation*, 74 Mich.L.Rev. 900 (1976).

ing such conclusion, the regulation must be held to be "in accordance" with the plan and plaintiffs' claim dismissed.

If, however, we are to try to enforce the legislative mandate that zoning in Sussex County amount to more than a series of ad hoc decisions, but rather should constitute the implementation of a thought-through development plan for the county, we must guard against any inclination to permit appropriate deference to degenerate into blind acceptance of Council's findings.

A review of the record before the Council and the Commission forces me to the conclusion that there is no substantial basis upon which the Council's finding may be sustained. For the reasons set out below the rezoning granted appears inconsistent with the fundamental thrust of the comprehensive development plan's vision of appropriate commercial land development in the county generally and in the southeastern coastal portion of the county particularly. As detailed above the comprehensive development plan contemplates that "strip commercial development scattered along major highways.... shall be discouraged" (1970 Plan, p. 12). The rezoning here of a 1.5 acre parcel abutting Route 1 to C–1 uses can only be understood to constitute the approval of strip commercial development.

Moreover, the C–1 designation is designed to serve "a wide variety of commercial ... activities generally serving a wide area". *See*, p. 888, *supra*. As such that designation (as opposed to the B–1 classification designed to serve commercial needs of a "relatively small area", *see*, p. 888, *supra*) is suited, in the language of the 1970 Plan, for "general commercial" (in-town) development or "planned community commercial centers." That Mr. Godwin's property, so far as the record before the Commission and the Council shows, would not qualify as a community commercial center (serving "5,000 to 40,000 people" and occupying "a carefully planned site layout", *see*, p. 886, *supra*) seems obvious. Its small size alone (less than one half the 4 to 10 acre size contemplated by

the 1970 Plan for such commercial centers) would disqualify it for such designation.

The 1976 Plan continues the emphasis found in the county-wide 1970 Plan upon planned centralized development of commercial centers. The regional or village concept of planning there used calls for development of a commercial zone in a central location for each such "village" which would again be a significant, planned commercial installation occupying from 25 to 50 acres. *See*, p. 887, *supra*. Even the smaller neighborhood commercial developments (which generally under the zoning ordinance would require only B–1 classification, *see*, p. 888, *supra*) are designed to be 3 to 5 acres.

■ While the approved comprehensive plan is clearly not meant specifically to locate in advance each commercial site to be developed, it is noteworthy that the 1976 Plan does not identify the ocean-side district north of Bethany Beach as best suited for such use. Given the existing residential character of that property and the unique advantages such property does possess for residential and recreational uses, it can hardly be regarded as surprising that both the 1970 and the 1976 Plans do not contemplate significant commercial uses in the vicinity of the subject parcel. Given the purpose of C–1 zoning stated in the general ordinance and the fact that no more intensive commercial classification is available, I equate the C–1 designation here awarded to Defendant Godwin with significant commercial development.

\* \* \*

It may well be sensible on some view of the public welfare to permit Mr. Godwin to expand the commercial activities he currently conducts on some of the lots comprising the parcel in question. Having carefully reviewed the comprehensive development plan adopted for the long-term benefit of the citizens and residents of Sussex County, I am forced to conclude, however, that the expansion permitted by a C–1 classification of that property is inconsist-

ent with the vision of the County's planned development adopted in that plan. Indeed, while the inherent limitations of planning are such that a long-term plan must be read sympathetically so as to permit necessary flexibility when the idealized plan is implemented by concrete development, the rezoning in this instance strikes me as fundamentally inconsistent with the basic thrust of the aspects of the land plan dealing with commercial development.

For the foregoing reasons, the pending motion for summary judgment will be granted. Plaintiffs shall present a form of implementing order on notice.