OPINION OF THE COURT
 

 Simons, J.
 

 Plaintiffs instituted this action to challenge an amendment to the New York City Zoning Resolution which established the Special Manhattan Bridge District in Chinatown. Plaintiffs either live or work in Chinatown or represent those who do and the gist of their complaint is that the new zoning will displace residents who require low-income housing because it will eliminate some of the existing housing without providing sufficient incentives for the development of affordable new housing to replace it. They seek judgment (1) declaring the Special Manhattan Bridge District amendment unconstitutional because it was not enacted pursuant to a well-considered plan and (2) imposing a mandatory injunction compelling the City to create a zoning plan for the District "which provides for and mandates a realistic opportunity for the construction of low income housing”. A divided Appellate Division dismissed the complaint finding the first and second causes of action failed to state a claim and the third cause of action, seeking to enjoin development of Henry Street Towers, moot after our decision in
 
 Chinese Staff & Workers Assn. v City of New York
 
 (68 NY2d 359). On this appeal, plaintiffs seek reinstatement of their first and second causes of action. They contend in their complaint that the amendment results in exclusionary zoning and, referring specifically to
 
 Southern Burlington County N.A.A.C.P v Township of Mount Laurel
 
 (92 NJ 158, 456 A2d 390
 
 [Mount Laurel II]),
 
 they seek affirmative relief similar to the relief fashioned in that decision. On
 
 *127
 
 appeal to this court they have modified their argument, however, placing principal reliance on our decision in
 
 Berenson v Town of New Castle
 
 (38 NY2d 102).
 

 I
 

 Plaintiff Asian Americans for Equality is a not-for-profit corporation engaged in supporting the rights of men and women of all races for improved housing, job opportunities and working conditions. The individual plaintiffs are now or formerly were residents of the area known as Chinatown, a center of Chinese culture and services in New York City where persons of Chinese and Asian ancestry reside. The individual plaintiffs allege either that they live in substandard housing there or that they were compelled to leave because of their inability to find suitable housing. They are persons of low income and none own property in Chinatown.
 
 [1]
 
 Defendants are the City of New York, various officers and agencies of the City and a private developer.
 

 The Special Manhattan Bridge District was created in 1981 by amendment to the City’s Zoning Resolution. The District encompasses 14 blocks in the area of the Manhattan Bridge and includes a part, but by no means all, of Chinatown. One area south of Monroe and Madison Streets and west of St. James Place, was excluded from the District because it had been redeveloped with public or publicly assisted housing. Others were excluded because they were commercial.
 

 The amendment was preceded by a study of the Manhattan Bridge area which confirmed that Chinatown contains a substantial proportion of high density, substandard housing occupied by low-income groups who work there in the garment, tourist and related industries. The amendment sought to correct these housing conditions by encouraging construction of new residential facilities, the rehabilitation of existing structures and the expansion of community facilities. To achieve those aims, it authorized development of mixed-income housing on land vacant or substantially vacant at the
 
 *128
 
 time the amendment was enacted.
 
 [2]
 
 The amendment provides that new construction must be authorized by special permit and regulated by a system of bonus points permitting increased density in new housing units for those developers who agree to do one or a combination of the following: (1) donate space for community facilities such as senior citizen or day care centers, educational facilities, or a combination of these; (2) construct low-income dwelling units; or (3) rehabilitate existing substandard housing. Defendant Henry Street Partners obtained a permit to build mixed-income housing with a greater floor area than otherwise permitted on vacant land on condition that it provide community facility space on the first floor and contribute $500,000 to help fund low-income housing in the District.
 

 Recognizing that the stated goals of the City’s study of the Manhattan Bridge area and the amendment creating the District are "very similar” to their own, plaintiffs nevertheless contend that the amendment is invalid because the means adopted to achieve them are inadequate. They charge that the bonuses awarded to permit high density housing favor moderate and high-income development and do not provide sufficient incentive to encourage construction of low-cost housing. They ask the court to require defendants to (1) improve existing housing in the Special Manhattan Bridge District, (2) provide more affordable low-income housing, (3) minimize the adverse affects of rehabilitation and (4) assure that the present residents who wish to stay in Chinatown are able to do so.
 

 Defendants assert that the complaint fails to state claims for legal relief because (1) the amendment creating the Special Manhattan Bridge was in accord with a well-considered plan for the City of New York and (2) the City has no obligation to zone specific areas for low-income housing nor any constitutional obligation to affirmatively provide substantive guarantees of low-income housing in Chinatown.
 

 II
 

 Zoning, as first devised, was a means of dividing the whole territory of a municipality into districts and imposing restrictions on the uses permitted in them. Restrictions on size and
 
 *129
 
 density of construction to control fire and traffic hazards, for example, or to eliminate offensive uses from residential districts were deemed a reasonable exercise of the police power
 
 (see, Euclid v Ambler Co.,
 
 272 US 365). Such traditional zoning is both restrictive and passive, providing minimum encouragement for development of the municipality as a whole.
 

 Special district zoning — exemplified by the Manhattan Bridge District questioned here — represents a significant departure from this traditional
 
 Euclidian
 
 zoning concept. It is based on the idea that zoning can be used as an incentive to further growth and development of the community rather than as a restraint. It is one of several imaginative legislative schemes intended to encourage, or even coerce, private developers into making the City a more pleasant and efficient place to live and work. Incentive zoning is based on the premise that certain uneconomic uses and amenities will not be provided by private development without economic incentive. The economic incentive frequently used, and the one used in the Manhattan Bridge District amendment, is the allowance of greater density within a proposed building, more floor area than permitted under general zoning rules, if developers provided certain amenities for the community. The amendment awards bonus points which entitle developers to expand their construction in return for increased construction of other, uneconomic projects such as low-cost housing, slum rehabilitation or public facilities. The bonus awarded for each amenity must be carefully structured, however, to make the cost-benefit equation favorable enough to induce the developer to provide the desired uneconomic benefit to the city but sufficiently limited to avoid a windfall to it.
 

 New York City has used these special district incentive programs to develop uneconomic but necessary uses since 1961. By means of them they have encouraged the preservation and redevelopment of the Broadway Theatre District, protected a major investment in the Special Lincoln Square District, preserved historic shopping areas such as Fifth Avenue and provided relocation housing in the Lower Third Avenue District
 
 (see generally,
 
 Elliott and Marcus,
 
 From Euclid to Ramapo: New Directions in Land Development Controls,
 
 1 Hofstra L Rev 56; Marcus and Groves, The New Zoning: Legal, Administrative, and Economic Concepts and Techniques, at 200
 
 et seq.
 
 [1970]; 2 Rathkopf, Zoning and Planning § 17.06 [2] [4th ed]). The districts created are not traditional zoning districts, narrowly limited to particular
 
 *130
 
 uses, but broad-based plans intended to preserve and enhance troubled areas of the City which, because of their singular characteristics, are important to its wealth and vitality. The Special Manhattan Bridge District was created to protect a badly deteriorated part of the unique area of New York City known as Chinatown.
 

 ra
 

 A
 

 In plaintiffs’ first cause of action, they allege that the Special Manhattan Bridge District enactment is "piecemeal” legislation. Piecemeal zoning exists when only part of the land within a municipality is regulated by the zoning laws
 
 (see,
 
 1 Anderson, New York Zoning Law and Practice §§ 5.03, 5.10 [3d ed]). However, the entire City of New York is zoned; indeed, New York City enacted the first comprehensive zoning law in the Nation in 1916. The litigation before us simply relates to one of many amendments to it. Manifestly, it is not "piecemeal” legislation.
 

 Plaintiffs further allege in the first cause of action that the amendment is "not comprehensive in outlook” and that the study on which it is based is not part of a well-considered plan. The pleadings refer to the amendment only in this one conclusory assertion; the remaining several paragraphs of the cause of action challenge the planning study which preceded it. The plan is attacked as "not well considered”, based upon insufficient information, "not related” to the District, "limited”, and not addressed to the community. The validity of the amendment is not dependent solely upon the adequacy of the study of the Manhattan Bridge area, however, but on all the City’s zoning policies and plans
 
 (see, Udell v Haas,
 
 21 NY2d 463) and nowhere in the complaint have plaintiffs alleged that the City has failed to plan for the balanced and well-ordered development of the community or that it has neglected to zone the City to provide for the needs of its inhabitants or those in the region. Accordingly, the first cause of action does not state a legal claim for relief.
 

 Moreover, plaintiffs have not only failed to plead a cause of action based upon the City’s failure to follow a well-considered plan but it is clear that under established law they have none
 
 (see, Guggenheimer v Ginzburg,
 
 43 NY2d 268, 275;
 
 Foley v D’Agostino,
 
 21 AD2d 60, 64-65).
 

 
 *131
 
 The power to zone is derived from the Legislature and must be exercised in the case of towns and villages in accord with a "comprehensive plan”
 
 (see,
 
 Town Law § 263; Village Law § 7-704) or in the case of cities in accord with a "well considered plan” (General City Law § 20 [25]). The requirement of a plan is based on the premise that "zoning is a means rather than an end” (1 Anderson, New York Zoning Law and Practice § 5.03, at 158 [3d ed]). The function of land regulation is to implement a plan for the future development of the community
 
 (Berenson v Town of New Castle,
 
 38 NY2d 102, 109,
 
 supra).
 
 Its exercise is constitutional only if the restrictions are necessary to protect the public health, safety or welfare. The requirement of a comprehensive or well-considered plan not only insures that local authorities act for the benefit of the community as a whole but protects individuals from arbitrary restrictions on the use of their land
 
 (see, Udell v Haas,
 
 21 NY2d,
 
 supra,
 
 at 469;
 
 see,
 
 Note,
 
 Comprehensive Plan Requirement in Zoning,
 
 12 Syracuse L Rev 342).
 

 A well-considered plan need not be contained in a single document; indeed, it need not be written at all. The court may satisfy itself that the municipality has a well-considered plan and that authorities are acting in the public interest to further it by examining all available and relevant evidence of the municipality’s land use policies
 
 (Udell v Haas, supra,
 
 at 470-472). Zoning legislation is tested not by whether it defines a well-considered plan but by whether it accords with a well-considered plan for the development of the community. When a zoning ordinance is amended, the court decides whether it accords with a well-considered plan in much the same way, by determining whether the original plan required amendment because of the community’s change and growth and whether the amendment is calculated to benefit the community as a whole as opposed to benefiting individuals or a group of individuals
 
 (see, Randolph v Town of Brookhaven,
 
 37 NY2d 544, 547;
 
 Matter of Town of Bedford v Village of Mount Kisco,
 
 33 NY2d 178, 187-188,
 
 rearg denied
 
 34 NY2d 668).
 

 Because zoning is a legislative act, zoning ordinances and amendments enjoy a strong presumption of constitutionality and the burden rests on the party attacking them to overcome that presumption beyond a reasonable doubt
 
 (Matter of Town of Bedford v Village of Mount Kisco, supra,
 
 at 186;
 
 Shepard v Village of Skaneateles,
 
 300 NY 115, 118). In claims such as this, the analysis follows traditional due process rules: if the
 
 *132
 
 zoning ordinance is adopted for a legitimate governmental purpose and there is a " 'reasonable relation between the end sought to be achieved by the regulation and the means used to achieve that end’ ”, it will be upheld
 
 (see, McMinn v Town of Oyster Bay,
 
 66 NY2d 544, 549, quoting
 
 French Investing Co. v City of New York,
 
 39 NY2d 587, 596,
 
 rearg denied
 
 40 NY2d 846,
 
 appeal dismissed
 
 429 US 990). An amendment which has been carefully studied, prepared and considered meets the general requirement for a well-considered plan and satisfies the statutory requirement
 
 (Randolph v Town of Brookhaven, supra,
 
 at 547;
 
 Matter of Town of Bedford v Village of Mount Kisco, supra,
 
 at 188-189;
 
 see,
 
 1 Anderson, New York Zoning Law and Practice § 5.03, at 161-162 [3d ed]). The court will not pass on its wisdom
 
 (see, Matter of Voelckers v Guelli,
 
 58 NY2d 170, 177).
 

 Manifestly, this legislation was reasonably related to its goals: the development of needed housing and the rehabilitation of existing housing in one area of Chinatown. There is no allegation that it was not consistent with the City’s general planning or that the City had failed to make provision for low-cost housing. That being so, and inasmuch as the amendment was enacted after study and consideration
 
 (see, Lai Chun Chan Jin v Board of Estimate,
 
 62 NY2d 900 [reciting the preenactment procedures of the present legislation]), it met the requirements for a well-considered plan set forth in
 
 Randolph v Town of Brookhaven (supra)
 
 and
 
 Matter of Town of Bedford v Village of Mount Kisco (supra).
 

 B
 

 Plaintiffs’ second cause of action seeks a mandatory injunction compelling the City to amend the Special Manhattan District Zoning to create greater opportunity for the construction of low-income housing. Plaintiffs do not attack the purpose of the amendment but rather the adequacy of the legislative scheme. They claim that the incentives offered will not provide sufficient low-cost housing because the rewards for doing so are too low compared to the rewards the amendment authorizes for other amenities. As pleaded, the cause of action seeks relief from exclusionary zoning similar to that granted in
 
 Southern Burlington County N.A.A.C.P v Township of Mount Laurel
 
 (67 NJ 151, 336 A2d 713,
 
 appeal dismissed
 
 423 US 808
 
 [Mount Laurel I];
 
 92 NJ 158, 456 A2d 390
 
 [Mount Laurel II], supra):
 
 a mandatory injunction compelling the City to correct the problem. On appeal plaintiffs rely primarily on
 
 *133
 
 the rule in
 
 Berenson v Town of New Castle
 
 (38 NY2d 102,
 
 supra),
 
 a decision of this court which held that a zoning ordinance would be annulled if it did not include districts for multiple housing when community and regional needs required such housing.
 
 Berenson
 
 did not mandate affirmative relief, nor have we had occasion to do so since that decision
 
 (see,
 
 Anderson & Mayo,
 
 Land Use Control,
 
 35 Syracuse L Rev 485, 488-489;
 
 see also, Blitz v Town of New Castle,
 
 94 AD2d 92, 98-99;
 
 see generally,
 
 Nolon,
 
 A Comparative Analysis of New Jersey’s Mount Laurel Cases with the Berenson Cases in New York,
 
 4 Pace Env L Rev 3).
 

 Exclusionary zoning may occur either because the municipality has limited the permissible uses within a community to exclude certain groups
 
 (see, e.g., Dowsey v Village of Kensington,
 
 257 NY 221), or has imposed restrictions so stringent that their practical effect is to prevent all but the wealthy from living there
 
 (see, Levitt v Incorporated Vil. of Sands Point,
 
 6 NY2d 269;
 
 and see generally,
 
 Annotation,
 
 Exclusionary Zoning,
 
 48 ALR3d 1210). It is a form of racial or socioeconomic discrimination which we have repeatedly condemned
 
 (see, e.g., Suffolk Hous. Servs. v Town of Brookhaven,
 
 70 NY2d 122;
 
 Robert E. Kurzius, Inc. v Incorporated Vil. of Upper Brookville,
 
 51 NY2d 338, 345;
 
 Berenson v Town of New Castle, supra; Matter of Golden v Planning Bd.,
 
 30 NY2d 359,
 
 appeal dismissed
 
 409 US 1003). If the party attacking the ordinance establishes that it was enacted for an exclusionary purpose or has an exclusionary effect, then the ordinance will be annulled
 
 (see Robert E. Kurzius, Inc. v Incorporated Vil. of Upper Brookville, supra).
 

 In
 
 Berenson
 
 we reviewed an ordinance which made no provision for low- or moderate-income housing in undeveloped areas of the municipality. We held that there must be a legitimate basis for such exclusions; limitations on development will be permitted only if the ordinance satisfies the needs of the community and also reflects a consideration of regional needs and requirements. We stated, however, that our concern was not "whether the zones, in themselves, are balanced communities, but whether the town itself, as provided by its zoning ordinances, will be a balanced and integrated community”
 
 (Berenson v Town of New Castle, supra,
 
 at 109). Constitutional principles are not necessarily offended if one or several uses are not included in a particular area or district of the community as long as adequate provision is made to accommodate the needs of the community and the
 
 *134
 
 region generally
 
 (see, Town of Pompey v Parker,
 
 53 AD2d 125, 127,
 
 affd
 
 44 NY2d 805).
 

 Applying these decisions plaintiffs’ second cause of action does not state a claim of exclusionary zoning. New York City does not now nor has it ever excluded low-cost housing in Chinatown or in the City generally. Low-income families now live in the District and will continue to live there, hopefully in rehabilitated or newly constructed low-cost housing, if the purposes of the amendment are fulfilled.
 

 Plaintiffs nevertheless contend that the amendment must be annulled because its effect will be exclusionary. They assert that not only will presently available sites be limited to luxury housing but they predict that new development will force them from their homes and, because the change in zoning favors construction of mixed-income apartments, present structures will be replaced by living accommodations they cannot afford. They note that the constitutional validity of zoning rests on the exercise of the police power for the general welfare and that the general welfare is no more abused by zoning which excludes the poor from a community than by zoning which forces them out of the community. Thus, their complaint seeks an order of the court compelling the City to provide low-cost housing, relief similar to that afforded in the
 
 Mount Laurel
 
 cases. Having failed to sustain that argument in the Appellate Division, they have adopted in this court the position of the Appellate Division dissenters that the
 
 Berenson
 
 rule prohibiting exclusionary zoning must be modified to define the "community” for zoning purposes as the 14-block area of the Special Manhattan Bridge District.
 

 Berenson
 
 cannot reasonably be extended to the facts presented here. The City is the governing authority, not the District and this action challenges its laws. When enacting them, City officials must address the needs of the broader community and must act not only for benefit of the District and its residents, but for the benefit of the City as a whole. Requiring City planners to include particular uses in every district may be truly obnoxious to the City’s over-all development, however, and applying the
 
 Berenson
 
 rule to a district as small as this 14-block area could defeat the intended purpose of special district zoning. The interpretation plaintiffs seek also runs counter to the rationale underlying the
 
 Berenson
 
 decision. That holding was deemed necessary to avoid the parochialism of elected local officials in communities which
 
 *135
 
 excluded minorities and socioeconomic groups from undeveloped areas of their municipalities to cater to a favored constituency. But here the question of exclusion relates to a Special District in the most highly developed municipality in the Nation, one which already has made extensive allowance for a variety of housing opportunities within its boundaries.
 

 Nor have plaintiffs stated a claim for affirmative relief. The
 
 Mount Laurel
 
 decisions
 
 (supra),
 
 which they rely upon, addressed a substantially different problem, the zoning of a suburban township approximately 20 miles from centers of employment in Camden and Philadelphia. The New Jersey Supreme Court held that the township’s zoning systematically excluded poor and middle-income persons from the community by means of artificially strict, cost-generating zoning restrictions
 
 (e.g.,
 
 minimum lot sizes, prohibition against mobile homes and multiple housing) and that it therefore violated the Equal Protection Clause of the State Constitution (67 NJ 151, 336 A2d 713,
 
 supra).
 
 The township responded to this decision by rezoning for low-cost housing three small, widely scattered areas (less than .25% of its land) suffering from swampy soil conditions, high noise levels and proximity to industrial uses. On a subsequent appeal the court ordered Mount Laurel to amend its ordinance to "create realistic opportunities” for low-cost housing in the township by means of government subsidies and inclusionary zoning. The court acknowledged that it was acting legislatively in determining the use appropriate to the area, and imposing a remedy (92 NJ,
 
 supra,
 
 at 243), but considered the action necessary because of the failure of the local government to address the problem. In doing so, it noted that the Legislature had directed establishment of a Statewide blueprint for the use and development of the land in New Jersey and that State planners had prepared a master plan in response to the statute, the State Development Guide Plan, designating Mount Laurel Township as a "growth” area. The affirmative relief granted by the court was consistent with the planners’ classification of the Mount Laurel Township
 
 (see,
 
 92 NJ 158, 220-248, 456 A2d 390, 421-435,
 
 supra).
 

 Both
 
 Mount Laurel
 
 and
 
 Berenson
 
 examined the limits expanding suburban communities could impose on the type of growth within their boundaries. This action, however, concerns a densely developed area in New York City with substantial low-cost housing, deteriorating to be sure, but bordering on an area of Chinatown containing modern public housing and in a City containing much more. Plaintiffs seek not to
 
 *136
 
 overcome exclusionary practices or to correct some past inequity by implementing an existing lawful State-wide legislative policy, as in
 
 Mount Laurel,
 
 but to overturn the considered decision of the executive and legislative branches of New York City’s government because they believe the City’s chosen remedy for this established area will prove inadequate.
 

 We recognize plaintiffs’ concerns over displacement and gentrification in the Chinatown area. Indeed, in a prior appeal involving the Special Manhattan Bridge District, we granted summary judgment annulling the special permit to Henry Street Partners and directed that construction could not commence until the City addressed the potential displacement of inhabitants and businesses before authorizing the work to progress
 
 (see, Chinese Staff & Workers Assn. v City of New York,
 
 68 NY2d 359,
 
 supra).
 
 But plaintiffs’ attack on the zoning laws, seeks much broader relief, a rewriting of the ordinance itself.
 

 In our prior decisions we have not compelled the City to facilitate the development of housing specifically affordable to lower-income households; a zoning plan is valid if the municipality provides an array of opportunities for housing facilities
 
 (see, Suffolk Hous. Servs. v Town of Brookhaven, 70
 
 NY2d 122,
 
 supra).
 
 We conclude that we should not extend that rule in this case. Those charged with the duty of addressing the problems of Chinatown chose to rezone the Manhattan Bridge area and provide housing incentives they deemed most suitable. They have attempted to use incentive zoning to provide realistic housing opportunities which include new apartments for the poor. Nothing in the legislative plan suggests that it will fail its purpose and plaintiffs do not allege that the solution is arbitrary or capricious or undertaken for an improper purpose, only that they would have zoned the area differently, or better, to avoid a potential future problem. Their allegations fail to state a cause of action entitling them to judicial relief.
 

 Accordingly, the order of the Appellate Division should be affirmed, with costs.
 

 Chief Judge Wachtler and Judges Kaye, Alexander, Ti-tone, Hancock, Jr., and Bellacosa concur.
 

 Order affirmed, with costs.
 

 [2]
 

 . A site is substantially vacant if less than 10% of the zoning lot contains residential buildings. New construction may not be authorized for such sites, however, until the developer submits an approved relocation plan and unless it affirms that it has not harassed the tenants to relocate.