*512 OPINION OF THE COURT
Michael D. Stallman, J.
In this action for declaratory judgment, defendants the City Council of the City of New York and the City of New York move, pursuant to CPLR 3212, for summary judgment declaring valid and enforceable certain amendments to the New York City Zoning Resolution and to the zoning map (the amendments), adopted by the New York City Council on April 30, 2003, which change the zoning for an area within the South Street Seaport Historic District from C6-4 to C6-2A.
Plaintiff Peck Slip Associates, L.L.C. is the owner of property within the Historic District, bounded by Peck Slip, and Pearl, Water, and Beekman Streets, known as 250 Water Street. Plaintiff seeks a declaration invalidating the amendments as unlawful, alleging that they: (1) constitute impermissible reverse spot zoning; (2) constitute an unlawful taking of plaintiffs property without just compensation; (3) unreasonably preclude the development of 250 Water Street; (4) discriminate against plaintiff; and (5) would unlawfully devalue 250 Water Street and lower the compensation paid to plaintiff, in the event of a condemnation by the City.
Background
The amendments embrace a 10-block area of Lower Manhattan (the area), bounded by Dover, Pearl, Fulton, and South Streets, all of which is part of the South Street Seaport Historic District. In 1961, the area was zoned C6-4, a medium bulk office district, allowing a floor area ratio (FAR) of up to 10.00, for commercial, community facility, and residential buildings.
In 1966, the “Lower Manhattan Plan,” commissioned by the Department of City Planning, called for high-density development along the Lower Manhattan waterfront, but also recognized the historic potential of the Seaport. That same year, state legislation created the South Street Seaport Maritime Museum Association to develop the Schermerhorn Row block as a maritime museum. In 1968, buildings on Schermerhorn Row were designated a New York City landmark block.
In 1968, the City Planning Commission adopted the Brooklyn Bridge Southeast Urban Renewal Plan, designating the area bounded by the Brooklyn Bridge on the north, the East River on the east, John Street on the south, and Pearl and Water Streets on the west, as an urban renewal area. Among the objec *513 tives was to develop the area in a manner compatible with the surrounding community, harmonizing it with the neighborhood in scale, configuration, and materials. The urban renewal plan was amended in 1970 to set forth in greater detail the Seaport redevelopment plans for the area bounded by Peck Slip on the north, John Street on the south, and Water and Front Streets on the west.
The urban renewal plan was amended several times, including the creation of the Special South Street Seaport District in 1972. As part of the effort to preserve the scale and character of the Seaport area, an air rights transfer plan was developed, allowing the transfer of excess development rights from specific lots in the core of the district (granting lots) to designated “receiving lots,” north of Peck Slip between Pearl and South Streets, and south and west of Schermerhorn Row in an area bounded by Fulton, John, Water, and Front Streets.
In 1977, the Landmarks Preservation Commission (LPC) designated a substantial portion of the South Street Seaport as the South Street Seaport Historic District, including the portion at issue here. The Historic District, which is a significant tourist destination, includes the Seaport Museum, artists’ galleries, shops, restaurants, a hotel, and residences, and contains the largest concentration of early 19th century commercial buildings in New York City. As a result of the designation as an historic district, any building demolitions, alterations, or new constructions are subject to review by the LPC, and conditional on the LPC’s grant of a certificate of appropriateness.
In 1998, the Special South Street Seaport District was incorporated as a subdistrict of the new Special Lower Manhattan District, and a total of 1,400,000 square feet of excess development rights from Seaport granting lots were transferred to the Chase Manhattan South Street Seaport Development Rights Bank for future use. Approximately 479,075 square feet of air rights are still available for future transfers from the Development Rights Bank.
On November 19, 2002, Community Board No. 1 adopted a resolution proposing amendments to the text of the Zoning Resolution and the zoning map which would rezone the area from C6-4 (medium bulk office district) to C6-2A (medium-density contextual commercial), and thus would reduce the maximum 10.00 FAR to 6.00 FAR for commercial buildings, 6.50 FAR for community facility buildings, and 6.02 for residential buildings in the area. (See Zoning Resolution §§ 33-122, 33-123, 34-112, *514 23-142.) To maintain the neighborhood context, buildings in a C6-2A district have a maximum height limit of 120 feet, and a street wall limit of 85 feet in height. (Zoning Resolution § 35-24.) Generally, C6-2A districts impose a minimum height limit of 60 feet (Zoning Resolution § 35-24); however, because many of the buildings within the Seaport Historic District are less than 60 feet high, the application for a zoning change requested that there be no minimum street wall height, in an effort to maintain the neighborhood context. The Community Board No. 1 resolution noted that C6-2A zoning is in place in Tribeca and Chelsea, and has been successful in reinforcing the look and feel of those neighborhoods.
The area contains several sites with development potential (soft sites), including the Con Edison building, the United States Post Office building, and five vacant lots, the largest of which is 250 Water Street.
Prior to the 1950s, 250 Water Street contained four- and five-story buildings, similar to those located throughout the area. Since those buildings were demolished, the property has been used as a parking lot. During the past 20 years, plaintiff has submitted several development proposals to the LPC; only one, for a 7.70 FAR office building, was approved in 1991. That project, however, was never built. Plaintiffs more recent proposals for development of the property, which were rejected by the LPC as disruptive of the district’s homogeneous quality, involved mixed-use residential and commercial buildings.
In September 2002, in response to plaintiff’s claim that development of 250 Water Street would not be feasible under C6-2A zoning, the City’s Economic Development Corporation (EDC) conducted a financial feasibility study of such a project. The EDC study concluded that, at market interest rates, a 6.02 FAR residential project would generate a 20% internal rate of return,* and if the project were financed using Liberty Bonds, the internal rate of return would be 35%. (See, defendants’ exhibit E.)
On December 12, 2002, Mayor Michael Bloomberg gave a speech entitled “New York City’s Vision for Lower Manhattan,” in which he announced that the Lower Manhattan Development *515 Corporation was about to make public seven proposals for the future of the World Trade Center site. In that speech, he also urged the building of two new neighborhoods in Lower Manhattan, south of Chambers Street, one near Fulton Street east of Broadway, and the other, south of Liberty Street, and projected that private developers, some of whom would use Liberty Bonds, would create at least 10,000 new apartments over the next 10 years. In order to encourage additional housing, he proposed relaxing some of the existing density restrictions on residential development in Lower Manhattan, and providing developers with a subsidy to make 20% of the new units affordable housing.
On January 22, 2003, the City Planning Commission (CPC) conducted a public hearing on the proposed zoning amendments. The CPC heard numerous speakers and received written statements in support of the amendments from persons residing in the neighborhood, represented elected officials, and civic organizations, such as the Municipal Art Society, the New York Landmarks Conservancy, and the South Street Seaport Museum. Carl Weisbrod, president of the Alliance for Downtown New York, also testified in support of the amendments. The main speakers opposing the amendments represented plaintiff and the Real Estate Board of New York.
In a report dated March 5, 2003, the CPC adopted a resolution approving the proposed rezoning; however, it increased the height limit from 120 feet to 170 feet, to provide increased flexibility, particularly for sites within the area designated as “receiving sites” for development rights in the development bank. In addition, the CPC modified the text with respect to lot coverage and quality housing regulations relating to C6-2A districts.
On March 31, 2003, the City Council Subcommittee on Zoning and Franchises held a public hearing on the proposed amendments, and on April 9, 2003 the Subcommittee recommended that the Land Use Committee of the City Council approve the CPC rezoning proposal, with one modification, changing the 170-foot maximum height limit to 120 feet. On April 9, 2003, the Land Use Committee approved the Subcommittee’s recommendation, with the modification that the maximum height limit be set at 145 feet. On April 30, 2003, the full City Council adopted resolutions amending the Zoning Resolution and the zoning map to change the area from a C6-4 district to a C6-2A district. The City Council did not, however, approve the *516 modifications approved by the CPC increasing the maximum permissible building height.
I
Zoning “implement[s] a plan for the future development of the community,” and must be done in accordance with a “comprehensive plan.” (Asian Ams. for Equality v Koch, 72 NY2d 121, 131 [1988].) “Unquestionably, municipalities can ‘enact land-use restrictions or controls to enhance the quality of life by preserving the character and desirable aesthetic features of a city.’ ” (Trustees of Union Coll, v Members of Schenectady City Council, 91 NY2d 161, 165 [1997], quoting Penn Cent. Transp. Co. v City of New York, 438 US 104, 129 [1978].)
The test of zoning legislation is whether it “accords with a well-considered plan for the development of the community.” (Asian Ams. for Equality v Koch, 72 NY2d at 131.)
“When a zoning ordinance is amended, the court decides whether it accords with a well-considered plan in much the same way, by determining whether the original plan required amendment because of the community’s change and growth and whether the amendment is calculated to benefit the community as a whole as opposed to benefiting individuals or a group of individuals.” (Id.)
Defendants contend that the zoning amendments are consistent with a well-considered plan to insure that the area will be compatible with the existing character and scale of the South Street Seaport Historic District, while still permitting reasonable development, and that the amendments are rationally related to a legitimate governmental purpose of maintaining the character of the Historic District. Plaintiff argues that the Mayor’s post-September 11, 2001 “Vision for Lower Manhattan,” announced in his speech of December 12, 2002, constitutes the “comprehensive plan” for the development of Lower Manhattan, and that the zoning amendments are inconsistent with that plan. Plaintiff quotes that portion of the Mayor’s speech that calls for relaxing existing density restrictions on residential development in Lower Manhattan. (Vision for Lower Manhattan at 19.) Plaintiff further argues that what constitutes the “comprehensive plan” is a question of fact, which is not amenable to summary judgment.
Calling the Mayor’s speech a comprehensive plan does not, however, make it one. The Mayor’s announcement is nei *517 ther more nor less than what it áppears to be — a speech setting forth general ideas regarding his vision for the future of Lower Manhattan, to coordinate with the then-imminent announcement by the Lower Manhattan Development Corporation of proposals for the development of the World Trade Center site.
The Mayor’s speech addresses three main topics: (1) connecting Lower Manhattan to the world around it; (2) developing new neighborhoods; and (3) creating public places that make Lower Manhattan appealing. Although the Mayor’s speech advocates increasing available housing, and the possibility of using Liberty Bonds for that purpose, it certainly does not constitute a “comprehensive plan” for zoning, like that evidenced by the Zoning Resolution and the existing land use plan for Lower Manhattan. The Mayor’s vision has not yet gone through the systematic process undertaken by the City in connection with the zoning amendments challenged by plaintiff. The Mayor’s announced goals are not necessarily incompatible with amendments and do not invalidate them. Moreover, there is no indication that, in suggesting that the density of residential development should be increased, the Mayor was addressing the area within the Historic District. The portion of the Mayor’s speech quoted by plaintiff refers specifically to Lower Manhattan’s highest density zoning districts, where densities of 15.00 FAR or greater are allowed, but residential development is limited to 12.00 FAR. It is in such high-density districts that the Mayor suggests relaxing existing density restrictions. He does not mention the lower density Seaport Historic District, or the appropriate density in that area. In any case, there is no indication that the Mayor has opposed the Zoning Resolution amendments, or that he finds them inconsistent with his vision for Lower Manhattan. Rather, more recently, on October 22, 2003, the Mayor appeared at the groundbreaking ceremony for a development project approved by the EDO within the Historic District, which was designed in accordance with C6-2A zoning regulations. At the groundbreaking, the Mayor’s office issued a press release in which he described the project as “at the very heart of the revitalization of the Historic District,” and “a benchmark for other redevelopment projects in the area . . . using the most up-to-date green technology, while retaining the character and originality of the older buildings.” (Defendants’ exhibit MM at 1.)
In sum, the Mayor’s speech does not raise questions of fact so as to defeat the City’s motion for summary judgment. It does not constitute a “comprehensive plan” — as that phrase is *518 understood in the zoning context; indeed, the Mayor may not unilaterally promulgate such a comprehensive zoning plan. Plaintiff has not raised a triable factual question as to whether the zoning amendments are part of a comprehensive plan. The amendments are part of the existing comprehensive plan for the Seaport Historic District and Lower Manhattan and are compatible with it.
II
Plaintiff asserts that, rather than being part of a plan to benefit the community, the amendments were aimed solely at preventing the development of its property, and constitute impermissible reverse spot zoning.
Spot zoning is defined as “ ‘the process of singling out a small parcel of land for a use classification totally different from that of the surrounding area for the benefit of the owner of said property to the detriment of other owners.’ ” (Boyles v Town Bd. of Town of Bethlehem, 278 AD2d 688, 690 [3d Dept 2000].) Reverse spot zoning is “a land-use decision which arbitrarily singles out a particular parcel for different, less favorable treatment than the neighboring ones.” (Penn Cent. Transp. Co. v City of New York, 438 US at 132.) In support of its argument, plaintiff cites the numerous statements in the oral and written testimony presented to the CPC opposing previous development proposals by plaintiff, which were rejected by the LPC. Plaintiff also relies heavily on the statement of Commissioner Cantor of the CPC, who stated during the hearing before the CPC that he believed that “this application was a case for spot zoning under a different name and it reflects the problems that have been going on at the 250 Water Street site for a long, long time.” (City Planning Commission Public Hearing of Mar. 5, 2003, at 5-6, defendants’ exhibit M.)
Even assuming arguendo that the zoning amendments “reflected” plaintiff’s problems obtaining LPC’s approval for plaintiff’s prior proposals for the site, that does not mean that the amendments constitute reverse spot zoning. The LPC has the responsibility to review the “appropriateness” of development projects in historic districts. (See Administrative Code of City of NY § 25-305.) Even under the C6-4 zoning standards, the LPC repeatedly found that plaintiffs development proposals “would be disruptive of the district’s homogeneous quality,” because of their size and scale. (See e.g. Letter of Landmarks Preservation Commission to Peck Slip Assoc., dated Dec. 21, 1984, defendants’ exhibit W at 1.)
*519 Plaintiffs history before the LPC supports the Community Board’s conclusion that a comprehensive change in the zoning of the area was necessary to “retain and build upon the special character and scale” of the Historic District, where the vast majority of the buildings were between 4.00 and 5.00 FAR and under 60 feet in height. (Community Bd No. 1 Resolution, dated Nov. 19, 2002, defendant’s exhibit F at 1; see also City Planning Commission Report, Mar. 5, 2003, calendar No. 15 [stating that “(t)he principal objective of this application is to adjust the underlying zoning of the area to be more consistent with the existing buildings and historic character of the Seaport area”].)
Relying on Coutant v Town of Poughkeepsie (69 AD2d 506 [2d Dept 1979]), plaintiff argues that the question of whether a rezoning plan constitutes reverse spot zoning is a question of fact that is not amenable to summary judgment. In Coutant, the trial court had granted summary judgment in plaintiffs favor, invalidating a town zoning ordinance. The Appellate Division reversed the grant of summary judgment, concluding that the plaintiff had not met the heavy burden of overcoming the presumption that “public officers have performed the duties imposed upon them by law.” (Id. at 510.) The Appellate Division concluded that summary judgment was inappropriate to determine whether the rezoning decision was in accordance with the comprehensive plan, where the comprehensive plan of the municipality was not easily recognizable. {Id. at 509-510.) Here, in contrast, the comprehensive plan, to maintain the 10-block area in character with the Seaport Historic District of which it is a part, is easily recognizable, and plaintiff has failed to overcome the presumption that government officials have acted in accordance with their duties in amending the Zoning Resolution.
Similarly, the fact that plaintiffs property is the largest single unbuilt parcel within the area affected by the zoning change does not alter the fact that zoning amendments affect more than only plaintiffs property. In fact, as the City has shown, the EDC recently approved a proposal for mixed-use development, including ground floor retail uses, gallery space, and nearly 100 residential units, for a 33,000-square-foot city-owned parcel of land within the 10-block area that meets the requirements of the C6-2A zoning. There are several other, if smaller, vacant parcels to which the zoning amendments will apply, as well as to the Con Edison and United States Post Office buildings.
Plaintiff argues that the character of the district could be protected by the LPC on a case-by-case basis. Whether case-by- *520 case treatment would be as effective and whether it might be more susceptible to challenges — perhaps as spot zoning — need not be addressed here. Suffice to say, plaintiffs assertion, even if valid, does not deprive the City Council of its power to treat the area comprehensively, as it did, by rezoning. Neither does it prove that the amendments are reverse spot zoning.
Ill
In its second cause of action, plaintiff contends that the rezoning renders the property incapable of producing a reasonable return, interferes with plaintiffs investment-backed expectations regarding the property, deprives plaintiff of economically beneficial and productive use of the property, and, therefore, constitutes an unlawful taking, in violation of the Due Process Clauses of the United States and New York State Constitutions.
The question of when property has been “taken” requires weighing the private and public interests. Where a regulation limits the use of land, but falls short of denying all beneficial use, it may still constitute a taking. (Palazzolo v Rhode Island, 533 US 606, 617 [2001].) However, even a substantial diminution of value of property, as a result of regulation, does not necessarily constitute a taking, (de St. Aubin v Flacke, 68 NY2d 66, 76-77 [1986].)
Defendants argue, as a threshold matter, that the question of whether there has been a taking of plaintiffs property is not ripe for review, because plaintiff has not sought a variance of the new zoning limits. Citing Scarsdale Supply Co. v Village of Scarsdale (8 NY2d 325 [1960]), plaintiff contends that, because it has challenged the constitutionality of the Zoning Resolution amendments, it need not seek a variance in order to be ripe for review. Plaintiff further contends that any effort to obtain administrative relief would be futile, and, therefore, its claim is ripe. However, in Scarsdale Supply, the Court of Appeals indicated that the zoning board did not have the power to review the discretion of the board of trustees which established the zoning ordinance that limited plaintiffs use of its property to residential uses. Here, in contrast, the Board of Standards and Appeals does have the authority to approve a development plan at a higher FAR than that permitted under the zoning ordinance.
Moreover, since the Court of Appeals ruling in Scarsdale Supply, the United States Supreme Court held that a claim that a government regulation constitutes a taking is not ripe where the developer has not obtained a final decision regarding the ap *521 plication of the zoning ordinance to its property. (Williamson County Regional Planning Commn. v Hamilton Bank of Johnson City, 473 US 172, 186 [1985].)
The fact that plaintiff failed to obtain approval from the LPC for its prior residential development plans under the prior Zoning Resolution, because of their incompatibility with the Historic District, does not mean that no economically feasible development would be approved under the amended Zoning Resolution, or that a variance would not be given. Such alleged futility is belied by the approval of development projects in C6-2A areas of Greenwich Village, Chelsea, and SoHo (see City Planning Commission Report at 17, defendant’s exhibit L), as has the development project for the city-owned parcel in the area. In addition, the EDC study shows that a residential building could be successfully developed consistent with the zoning amendments.
Accordingly, plaintiff’s taking claim must be dismissed as premature.
IV
Plaintiffs third cause of action generally alleges that because of the zoning amendments, plaintiff will be compelled to maintain its property as a parking lot, surrounded by office, residential, and mixed-use buildings; and that the amendments, as related to 250 Water Street, have not been enacted with reasonable consideration of the general character of the Historic District, and do not accommodate present and future regional housing needs, and are, therefore, unlawful.-
This cause of action is basically a restatement of the two previous causes of action. The zoning amendments were part of a well-considered plan concerning the South Street Seaport Historic District. In light of the successful accomplishment of residential projects in other C6-2A districts such as Greenwich Village, Chelsea, and SoHo, it is premature to conclude that 250 Water Street cannot ultimately be residentiary developed consistent with C6-2A zoning. Whether the comprehensive plan, as amended, adequately accommodates present and future regional housing needs is a policy decision best determined in the normal course of the planning and legislative process by those branches of government directly concerned with that process.
V
Plaintiffs fourth cause of action alleges that the zoning amendments unlawfully discriminate against plaintiff, in viola *522 tion of State and Federal Equal Protection Clauses. Plaintiffs claim of discrimination is similar to its claim of reverse spot zoning; however, couched in constitutional, rather than statutory terms. This court has already found that plaintiff has not proven that its property is being treated differently from comparable property.
Plaintiff has not met its burden to overcome the strong presumption that the Zoning Resolution amendments are constitutional (Asian Ams. for Equality v Koch, 72 NY2d at 131). Moreover, plaintiff has not shown a necessary element of an equal protection claim: that it and its parcel are being treated differently from others similarly situated.
VI
Plaintiffs fifth cause of action alleges, on information and belief, that the City is considering a condemnation proceeding against 250 Water Street, that the zoning amendments would result in a decreased value of the property, and that, therefore, the rezoning is confiscatory in nature and void.
Plaintiff has submitted no substantiation for its allegation regarding the City’s purported intention. Plaintiff’s unsupported surmise that the City may condemn the parcel some time in the future, and the impact such condemnation would have on the valuation of plaintiffs property, is speculative at best; at a minimum, it is premature. (See J.W. Mays, Inc. v State of New York, 300 AD2d 545 [2d Dept 2002].)
Conclusion
Accordingly, it is hereby ordered that defendants’ motion for summary judgment is granted consistent with this opinion; and it is further ordered and declared that the amendments adopted by the City Council on April 30, 2003, approving the decision of the City Planning Commission amending the text of Zoning Resolution, article IX, chapter 1 (Special Lower Manhattan District), relating to regulation for the South Street Seaport, Manhattan, and changing sectional maps 12b and 12d of the zoning map from a C6-4 district to a C6-2A district are valid and enforceable.

 An “internal rate of return” is a method of determining an overall average annual compound rate of return on a series of unequal cash flows which adjusts to reflect the value of money over time, and enables a developer to compare its contemplated investment in real estate with other types of investments. (See affidavit of Vishaan Chakrabarti, dated Nov. 12, 2003, at 8.)