Titone, J.
(dissenting). Only two years ago, in People ex rel. Arcara v Cloud Books (68 NY2d 553, 557 [Arcara II]), this court observed "New York has a long history and tradition of fostering freedom of expression, often tolerating and supporting works which in other States would be found offensive to the community”. Consequently, we held in the context of a public nuisance statute affecting an "adult” bookstore that the State Constitution is more protective of expression than the *565 Federal Constitution (id., at 557-559; NY Const, art I, § 8).[1] By applying the content-neutral test of Arcara to the content-based ordinance challenged here, the majority has ignored a fundamental touchstone of free speech jurisprudence — the distinction between the standards for evaluating the validity of content-based and content-neutral regulations. Such analysis can be explained only if the majority decision is viewed as incorporating, under our State Constitution, the Federal test for determining whether a zoning ordinance is "content-based.” Because I believe that the application of the standard outlined in Renton v Playtime Theatres (475 US 41) severely undermines this State’s strict protection against content-based regulations, and indicates an abandonment of the highly protective view of speech taken in Arcara, I dissent.
I
As a threshold matter, it is imperative to point out what this case is not. This case does not involve obscene material (see, Miller v California, 413 US 15), commercial speech (see, Central Hudson Gas & Elec. v Public Serv. Commn., 447 US 557), fighting words (see, Chaplinsky v New Hampshire, 315 US 568), libel (see, Gertz v Robert Welch, Inc., 418 US 323), child pornography (see, New York v Ferber, 458 US 747), incitement to imminent lawless action (see, Brandenburg v Ohio, 395 US 444), or privacy concerns implicated when there exists a "captive audience” (see, Lehman v City of Shaker Hgts., 418 US 298; Kovacs v Cooper, 336 US 77). "What this case does involve is the constitutional permissibility of selective interference with protected speech whose content is thought to produce distasteful effects” (Young v American Mini Theatres, 427 US 50, 85 [Stewart, J., dissenting]). Thus, we are dealing solely with nonobscene, adult-oriented material shown only to willing adults on private property as a form of entertainment. Such material is clearly entitled to full First Amendment protection (see, Schad v Mount Ephraim, 452 US 61, 65; Joseph Burstyn, Inc. v Wilson, 343 US 495, 502-503).
In addition, although zoning ordinances usually enjoy a presumption of constitutionality (see, Asian Ams. for Equality v Koch, 72 NY2d 121, 131; McMinn v Town of Oyster Bay, 66 *566 NY2d 544, 549), that presumption "carries little, if any, weight where the zoning regulation trenches on rights of expression protected under the First Amendment” (Schad v Mount Ephraim, supra, at 77 [Blackmun, J., concurring]; see, Young v American Mini Theatres, supra, at 75 [Powell, J., concurring]; Moore v East Cleveland, 431 US 494, 514 [Stevens, J., concurring]). Indeed, this court has recognized that zoning ordinances must be carefully scrutinized to discern whether a municipality has attempted to conceal exclusionary zoning practices (Suffolk Hous. Servs. v Town of Brookhaven, 70 NY2d 122, 129; see, Asian Ams. for Equality v Koch, supra, at 133). That same concern and scrutiny must be applied to zoning ordinances that potentially impinge upon free speech guarantees. Since Islip’s zoning ordinance is a content-based regulation that severely impinges on appellants’ freedom of speech, the presumption of constitutionality is overcome beyond a reasonable doubt (see, Asian Ams. for Equality v Koch, supra, at 131).
The central question presented by this appeal is whether the challenged zoning ordinance is an attempt to regulate bookstores by their content, which would be subject to a traditional strict scrutiny analysis (see, Police Dept. v Mosley, 408 US 92, 95, 98-99), or is instead a "content-neutral” rule directed only toward the unwanted "secondary effects” of certain kinds of business establishments in the community. This initial determination depends on whether the recently revised Federal concept of content-neutral legislation, as outlined in Renton v Playtime Theatres (475 US 41, supra), is also controlling under the State freedom of expression guarantee. I believe it is not.
II
The majority’s characterization of Islip’s ordinance as content-neutral (majority opn, at 561) is flawed because "time, place, and manner regulations must be 'applicable to all speech irrespective of content’ ” (Consolidated Edison Co. v Public Serv. Commn., 447 US 530, 536, citing Erznoznik v City of Jacksonville, 422 US 205, 209; see, Pacific Gas & Elec. Co. v Public Utils. Commn., 475 US 1, 20). In light of the language of the challenged ordinance, it cannot be denied that Islip has selectively imposed limitations on the placement of certain business establishments based exclusively on the content of the material viewed on the premises. Although the ordinance *567 is not explicitly predicated on the content of the material, its application is predicated upon whether the use is "not open to the public generally but excludes any minor by reason of age.” The Town maintains that the ordinance is not content-based because it does not define uses based upon the content of the material purveyed, but rather upon whether or not minors are excluded. Thus, their argument goes, the controlling distinction is age, not the content of the material. Such artful draftsmanship plainly cannot avoid implicating the guarantees of freedom of speech, since it is patently directed against establishments purveying a particular category of material, and has the effect of singling out a certain category of uses based solely upon the content of the material contained on the premises. Such differential treatment manifestly invokes heightened scrutiny (see, Minneapolis Star & Tribune Co. v Minnesota Commr. of Revenue, 460 US 575, 582-585).
Under traditional analysis, a content-based regulation of protected speech, may be sustained "only if the government can show that the regulation is a precisely drawn means of serving a compelling state interest” (Consolidated Edison Co. v Public Serv. Commn., supra, at 540; see, Pacific Gas & Elec. Co. v Public Utils. Commn., supra, at 19). Indeed, this court has stated, "government regulation designed to suppress traditional communicative activity because of its content or potential impact is subject to the most rigorous scrutiny. Absent some compelling justification, such as a likelihood that speech will incite 'imminent lawless action’, content-oriented restrictions may not stand” (Matter of Consolidated Edison Co. v Public Serv. Commn., 47 NY2d 94, citing Brandenburg v Ohio, 395 US 444, 447, supra [emphasis added], revd on other grounds 447 US 530).
While there can be no doubt that a municipality has an interest in "the stability and revitalization of the neighborhoods” (majority opn, at 549), this interest cannot be considered "compelling” without at least some showing that the form of expression to be regulated has an actual and specific deleterious effect on the community. Here, there was no such showing.
To support its view that the Islip ordinance is constitutionally unobjectionable, the majority relies heavily on the written report prepared by the Town prior to enactment of its adult-use ordinance. The majority states that the report "demonstrated, by analysis of each adult entertainment business, *568 the harmful effect of these uses on the surrounding area” and that the research and data underlying the report demonstrated that the location of adult businesses in certain areas "driv[es] out traditional downtown businesses * * * increased] criminal activity and lower[s] nearby residential property values.” (Majority opn, at 549, 553.) The report, however, is based primarily on general information pertaining to other locales throughout the country, most of which are in urban settings. Such findings thus have little bearing on what presently exists in the suburban Town of Islip. Additionally, the individual site analysis conducted by the Town in its own study is, indeed, most telling. Referring to appellants’ bookstore, the site analysis states:
"This adult book store is adjacent to the Regent Theatre, an adult cinema. The close proximity of these two restricted businesses creates a void in the commercial center of Main Street.
"It also creates an area which certain shoppers will avoid due to their preference not to associate with these businesses. ” (Emphasis supplied.)
As this analysis makes clear, the Town residents’ distaste for the message conveyed in appellants’ establishment lies even at the root of the Town’s stated business concerns. However, the residents’ "preference not to associate with” appellants’ bookstore, is not sufficient to justify the content-based ordinance, since they "could effectively avoid further bombardment of their sensibilities simply by averting their eyes” (Cohen v California, 403 US 15, 21). Moreover, despite the report’s assertions that appellants’ store occupies a "dead zone”, the Town has stipulated that "during the period 1978 to present, real property values have increased in the immediate vicinity of respondent’s location and * * * vacancy rates for commercial premises have decreased over the same period in the same area.” In addition, there is absolutely no proof whatsoever of increased criminal activity within or around appellants’ bookstore. Plainly, the Town has failed to prove that appellants’ bookstore has " 'delayed the upsurge’ of downtown Bay Shore.” (Majority opn, at 534.)[2]
*569 Without proof of actual secondary effects directly attributable to appellants’ bookstore, there exists nothing but the Town’s fear of appellants’ bookstore. In principle, Islip’s zoning ordinance is no different than the City of Chattanooga trying to prevent the showing of the musical "Hair” because of its explicit treatment of sex, and the Town’s beliefs that such material was inappropriate for the community (see, Southeastern Promotions v Conrad, 420 US 546). However, public distaste and societal fear of the potential effects of certain speech has never provided sufficient justification to suppress protected speech (see, Whitney v California, 274 US 357, 376 [Brandeis, J., concurring] ["Men feared witches and burnt women. It is the function of speech to free men from the bondage of irrational fears.”]; Tinker v Des Moines School Dist., 393 US 503, 508).
Ill
In the face of Islip’s unproven "compelling” need to regulate adult-uses, the majority nonetheless upholds the ordinance by purportedly applying the test we applied in People ex rel. Arcara v Cloud Books (supra) (majority opn, at 558), a case which concerned a content-neutral nuisance statute. The majority eschews traditional content-based analysis in favor of content-neutral analysis because the ordinance "was not a purposeful attempt to regulate speech and its effect on expression is only incidental.” (Majority opn, at 557 [emphasis added].)* *[3] Indeed, the majority relies heavily on the fact that the stated purpose of the ordinance is "to address the harms to *570 bystanders, [and] neighboring property owners,” and that "[t]he Town did not single out adult uses * * * because of any hostility to the views expressed in the material they purveyed” (majority opn, at 557).[4] Such reliance on the purpose of Islip’s ordinance is remarkably similar to the "predominant purpose” test espoused in Renton v Playtime Theatres (supra), and thoroughly discussed by the majority. Although the majority does not explicitly adopt or apply the "predominant purpose” test, in the absence of some other clearly articulated principle, the majority opinion must be read as an incorporation of the "predominant purpose” test into the framework of our State’s freedom of speech jurisprudence. It is the use of *571 this test, or any other test, that converts a content-based regulation into a content-neutral regulation, which forces my divergence from the majority.
In Renton, the Supreme Court held that a statute may be characterized as content-neutral when its "predominant purpose” is to effectuate a goal unrelated to restricting expression. Critically, this decision adds a completely new twist to First Amendment jurisprudence because it allows an otherwise content-based regulation to be recast as content-neutral so long as the stated motivation for the regulation is something other than the suppression of speech. The result is simple. Content-based regulations which would normally be subject to strict scrutiny and a compelling need standard become subject to the much lower showing of substantial need. And, regulations which would be unconstitutional if judged under the traditional compelling need standard pass constitutional muster under Renton whenever the ordinance is justified by reliance on secondary effects — whatever that means. Taken to its logical extreme this analysis could adversely affect our free speech jurisprudence in all areas, including pure political speech (Stone, Content-Neutral Restrictions, 54 U Chi L Rev 46, 115 [1987]; see, Boos v Barry, 485 US 312, —, 108 S Ct 1157, 1163-1164 [Renton discussed in context of statute restricting picketing in front of foreign embassies]; but see, Tribe, American Constitutional Law § 12-3, at 799, n 17 [2d ed] ["The Renton view will likely prove to be an aberration limited to the context of sexually explicit materials.”]).[5]
[6]
In an important sense, the "predominant purpose” test represents a mere linguistic device to circumvent the traditional rule that content-based regulations be supported by an actual compelling governmental need (see, Consolidated Edison Co. v Public Serv. Commn., 447 US, supra, at 540; Pacific Gas & Elec. Co. v Public Utils. Commn., 475 US, supra, at 19). *572 By emphasizing the stated purpose of the legislation, the Renton analysis virtually binds courts to limit their inquiry to whether the stated "predominant” legislative motive does not involve content, and, if not, to rely on that stated motive (see, Walnut Props. v City of Whittier, 808 F2d 1331, 1334 [9th Cir]). This is troublesome for two very basic reasons.
First, inquiries into legislative motives or purposes are hazardous and inexact (see, United States v O’Brien, 391 US 367, 380). It is unlikely that a municipality would explicitly acknowledge a motive to restrict a particular message, and it is all to easy for local legislatures to justify restrictions by verbalizing some legitimate governmental interest in support (Stone, op. cit., at 56). Additionally, there exists the possibility that, in enacting legislation aimed ostensibly at some other goal, a local legislature will, consciously or unconsciously, be influenced by its own view of the restricted speech (id.). It is for precisely this reason that any regulation whose application depends on content must be judged as a content-based regulation regardless of the underlying motive. Indeed, prior to Renton all content-based regulations were simply presumed to be founded upon improper motives and judged accordingly.[6] As Justice Brennan pointed out in his dissent in Renton, "[t]he fact that adult movie theatres may cause harmful 'secondary’ land-use effects may arguably [provide] a compelling reason to regulate such establishments; it does not mean, however, that such regulations are content-neutral” (Renton v Playtime Theatres, supra, at 56 [Brennan, J., dissenting]).
My second concern is that the "predominant purpose” test encourages litigants to defend politically directed content-based regulations by concocting potential secondary effects of certain speech such as congestion, visual clutter, security, or deterioration of property values (see, Boos v Barry, 485 US 312, —, 108 S Ct, supra, at 1171 [Brennan, J., concurring in part]). As Justice Brennan recently stated, "[n]o doubt a plausible argument could be made that the political gather *573 ings of some parties are more likely than others to attract large crowds causing congestion, that picketing for certain causes is more likely than other picketing to cause visual clutter, or that speakers delivering a particular message are more likely than others to attract an unruly audience” (id.).
Indeed, Islip’s primary rationale — fostering community renewal by eliminating uses that are distasteful to shoppers and discourage their patronage — could just as easily be applied to justify a regulation prohibiting certain unpopular minority political or religious groups, such as gay rights activists or Shi’ite Muslims, from locating their offices in a downtown shopping district. And, under the majority’s approach, such regulations would not be subject to the "compelling need” standard ordinarily applied in content-based challenges as long as the restriction was "minimal” and the prohibited uses were permitted in other locales. Thus, reliance on secondary effects can become a pretext for suppressing unfavorable expression (see, Young v American Mini Theatres, supra, at 84 [Powell, J., concurring]).
This case is the perfect example of the failings of the "predominant purpose” test. The Town of Islip’s report on the secondary effects of adult uses on surrounding areas has proven to be incorrect, at least insofar as it applies to appellants’ bookstore. Property values have increased, and commercial vacancies have decreased. There exists no actual proof of secondary effects. Plainly, public distaste for speech has never, without more, provided sufficient justification to suppress protected speech (see, Boos v Barry, 485 US 312, —, 108 S Ct, supra, at 1171 [Brennan, J., concurring in part]).
Further, despite its stated rationale, the Town’s actual motive is suspect here. If Islip were truly concerned only with the secondary effects of neighborhood deterioration, it would have attempted to regulate all kinds of uses that create such secondary effects, including pawnshops, and other potentially undesirable retail stores such as secondhand, and gun stores (see, Islip Town Code § 68-271 [D]; § 68-286 [H]; § 68-301 [D] [zoning ordinances affecting business districts]). Because Islip has failed to "demonstrate a comprehensive coordinated effort” to eliminate all uses which create unwanted secondary effects from its business districts, its zoning ordinance is plainly underinclusive and represents a disguised effort to prohibit what it considers undesirable expression (see, Metromedia, Inc. v San Diego, 453 US 490, 531 [Brennan, J., concurring]).
*574 Under our State Constitution, we should not countenance a rule that permits otherwise content-based regulation to be recast as content-neutral simply because the stated purpose is to control certain "secondary effects” of that form of speech. This court has repeatedly stated that New York State offers greater freedom of speech guarantees under our State Constitution than the minimal protection afforded individuals under the Federal Constitution (see, People ex rel. Arcara v Cloud Books, supra, at 557-559; People v P. J. Video, 68 NY2d 296, cert denied 479 US 1091; Matter of Beach v Shanley, 62 NY2d 241, 255-256 [Wachtler, J., concurring]; Bellanca v State Liq. Auth., 54 NY2d 228, cert denied 456 US 1006). To continue to provide New York State citizens broader free speech protection, the "predominant purpose” test must be rejected under our State Constitution.
IV
Even assuming that Islip’s content-based ordinance can somehow be recast as a content-neutral zoning ordinance of general application, the ordinance would still violate our State Constitution.[7] In People ex rel. Arcara v Cloud Books (65 NY2d 324 [Arcara I]), this court applied the content-neutral O’Brien test (see, United States v O’Brien, supra, at 377)[8] to a nuisance statute which had been used to temporarily close an adult *575 bookstore because some patrons had been using the premises to commit illegal sexual acts. Although the regulation was content-neutral and was aimed purely at nonexpressive conduct, we concluded that there was still an impermissible impact upon speech because the bookstore was forced to close, albeit only temporarily. We concluded that the prosecutor had not demonstrated that closing the defendant’s store was the "least restrictive means” to abate the nuisance created by some of its customers (id.).
On appeal, the Supreme Court reversed, holding that the defendant’s First Amendment rights had not been implicated because the nuisance statute was aimed at noncommunicative activity and any impact on the defendant’s speech was only incidental (see, Arcara v Cloud Books, 478 US 697, 702-705). On remand, in Arcara II (68 NY2d 553, supra) we held that regardless of whether a regulation is aimed at speech or at noncommunicative activity, our State Constitution requires that the regulation satisfy a "least restrictive means” standard if it affects expression. Indeed, we stated: "The crucial factor in determining whether State action affects freedom of expression is the impact of the action on the protected activity and not the nature of the activity which prompted the government to act. The test, in traditional terms, is not who is aimed at but who is hit” (People ex rel. Arcara v Cloud Books, supra, at 558 [emphasis added]). Hence, any content-neutral regulation which has the affect of "hitting” speech must be "no broader than needed to achieve its purpose” (id., at 558), a test which logically requires use of the least restrictive means (Tribe, Constitutional Law § 12-7, at 829, n 23 [2d ed]; Note, Padlock Orders and Nuisance Laws: The First Amendment in Arcara v Cloud Books, 51 Alb L Rev 1007, 1016). In this State, the purpose of an ordinance is constitutionally irrelevant for it is only the impact that matters. Hence, we have already rejected any type of "predominant purpose” test. In addition, we noted that the "least restrictive means” includes actual proof that other less intrusive methods had been tried and proved unavailing (68 NY2d, at 559). For this reason, the majority’s reliance on United States v Albertini (472 US 675), to the extent that case may be perceived as stating a different standard, is unpersuasive (majority opn, at 559, n 7).
Although the Town of Islip’s zoning ordinance was aimed at secondary effects, appellants’ speech has been hit. Thus, Arcara imposes a burden on Islip to prove that it has chosen the least restrictive means to accomplish its purpose. This in- *576 eludes proof that other less intrusive means had been tried and failed. Islip has simply failed to do so.
The Town of Islip has completely banned adult-uses from all business districts (subject to an amortization provision), and has allowed them to operate only in the industrial districts (subject to dispersal requirements). This is not the least restrictive means by which the Town could have attempted to prevent the unwanted secondary effects flowing from adult businesses. First, the Town could have given nonconforming uses the protection of a grandfather clause.[9] Since the parties have stipulated that property values have increased and vacancy rates decreased despite appellants’ presence, a grandfather provision permitting appellants’ continued use would clearly not have been inconsistent with the Town’s rehabilitative plan. If the grandfather clause proved troublesome, then, and only then, would the Town have been empowered to proceed in a more restrictive fashion (see, People ex rel. Arcara v Cloud Books, 68 NY2d, supra, at 559). In addition, the Town could have simply required dispersal of adult uses throughout all commercial districts, rather than banning them entirely from business districts.[10] By curtailing the influx of new business in both the business and industrial districts and subjecting them to dispersal requirements, the Town’s ordinance would have achieved its purpose of preventing secondary effects in the most narrow way.* [11]
The severity of the impact created by Islip’s ordinance — an issue the majority has ignored — is also problematic. In Arcara, the injunction imposed under the nuisance statute would have *577 resulted in closing the defendant’s store for only one year, and, the defendant could have immediately opened a new store next door. Here, in contrast, appellants’ store, and other shut-down adult uses, may never reopen at their present locations. The stores’ only option is to find feasible commercial space in the industrial zone. This is a far more forceful "hit” than that which occurred in Arcara.
In response to these constitutional problems, a pervading theme throughout the majority opinion is that the ordinance does not impose any limitation on the "ability of the creators or sellers [of adult-oriented material] to distribute it” and that "the effectiveness of the message contained in adult materials, unlike the effectiveness of the message contained in political speech * * * is not at all dependent on the place where made.” (Majority opn, at 554, 558.) Additionally, the majority finds solace in the fact that adult uses may exist, as of right, in several areas of the Town and that "regular” bookstores may "sell adult materials in segregated areas of their stores without being subject to the provisions of the ordinance.” (Majority opn, at 558.) My response is threefold.
First, the ability of creators and sellers to distribute their products is completely dependent upon the existence and operation of bookstores and movie houses. Without an effective means of distribution, the message, for all intents and purposes, is silenced (see, Smith v California, 361 US 147, 150). Second, removing any form of speech from the heart of a downtown community and relegating it to an industrial district away from the populace, will undoubtedly effect the ability of the message to be communicated. Here, for instance, the message of adult material pertains to the loosening of puritanical ethics in favor of relaxed sexual mores in the society. The elimination of this message from "Main Street” is contrary to this message, and, thereby destroys its effectiveness.
Third, and finally, the fact that the ordinance does not completely ban adult material is of no consequence, and does not justify applying a less exacting level of scrutiny. Indeed, the Supreme Court has consistently rejected the suggestion that a content-based regulation may be justified by a showing that speakers have alternative means of expression (Consolidated Edison Co. v Public Serv. Commn., 447 US, supra, at 541, n 10; Virginia Pharmacy Bd. v Virginia Consumer Council, 425 US 748, 757, n 15; Southeastern Promotions v Conrad, *578 420 US, supra, at 556; Spence v Washington, 418 US 405, 411, n 4). Moreover, even in the context of a content-neutral regulation, the Supreme Court has stated that "[o]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place” (Schneider v State, 308 US 147, 163).
Thus, under our clear holding in Arcara, Islip’s ordinance has simply been painted with too broad a brush. Indeed, it is anomalous that we offered more protection against the content-neutral nuisance statute in Arcara than we have offered against Islip’s content-based zoning ordinance.
V
By concluding that Islip’s ordinance is violative of appellants’ guarantee of freedom of speech under our State Constitution, I do not belittle the valid concerns asserted by the Town of Islip. It may well be that such concerns, if proven real, would constitute the kind of compelling need necessary to justify a content-based regulation. Here, however, the close judicial scrutiny that the law requires is not satisfied. For "it is in those instances where protected speech grates most unpleasantly against the sensibilities that judicial vigilance must be at its height” (Young v American Mini Theatres, supra, at 87 [Stewart, J., dissenting]). My obvious preference for content-neutral regulations is based simply on the notion that "[c]ourts can take no better measure to assure that laws will be just than to require that laws be equal in operation” (Railway Express v New York, 336 US 106, 113 [Jackson, J., concurring]).
Accordingly, since I conclude that the Town of Islip’s zoning ordinance is content-based and is not justified by any compelling need, I dissent.

. NY Constitution, article I, §8 provides in pertinent part: "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press.”

. Contrary to the majority’s assertion, I do not claim that the presence of appellants’ store was responsible for the economic improvement which occurred in Bay Shore (majority opn, at 557, n 6). My reliance on the stipulated facts is simply to demonstrate that the perceived fear of financial devastation caused by a "skid-row” effect did not occur. I make no claim *569 whatsoever as to the causal relationship between appellants’ bookstore and the economic growth which has occurred in Islip. To the contrary, the majority posits that increases in real property values are due to inflation in Long Island (majority opn, at 557, n 6). Such information is not included in the stipulated facts, and is not so apparent as to be subject to judicial notice.
In addition, neither the Town nor the majority, has sufficiently proven that any "past deterioration” that may have existed in Islip was directly attributable to appellants’ bookstore (majority opn, at 553). The Town’s mere "prediction that, unless remedied [by closing adult-uses], [such] deterioration would continue” (majority opn, at 553) is insufficient to create a compelling need. Content-based jurisprudence does not condone such preemptive strikes (see, Brandenburg v Ohio, 395 US 444, 447).

. The majority suggests that Islip’s ordinance does not "constitute censorship because it does not distinguish between the messages that various adult businesses convey.” (Majority opn, at 558.) This statement is based on the apparent distinction between subject matter and viewpoint restrictions which originate in Justice Stevens’ plurality opinion in Young v American Mini Theatres (427 US 50). In advancing his two-tier approach to *570 First Amendment jurisprudence, Justice Stevens stated, "[t]he essence of that rule [prohibiting regulation based on the content of protected speech] is the need for absolute neutrality by the government; its regulation of communication may not be affected by sympathy or hostility for the point of view being expressed by the communicator” (id,., at 67). This "absolute neutrality” language spurred academic commentators to urge that there be different tests for those content-based restrictions that are viewpoint-neutral and those that are not (see, Farber, Content Regulation and the First Amendment: A Revisionist View, 68 Geo LJ 727 [1980]; Stephan, The First Amendment and Content Discrimination, 68 Va L Rev 203 [1982]; Stone, Restrictions of Speech Because of its Content: The Peculiar Case of Subject-Matter Restrictions, 46 U Chi L Rev 81 [1978]). However, the Supreme Court has continually stated that "[t]he First Amendment’s hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic” (Consolidated Edison Co. v Public Serv. Commn., 447 US 530, 537; see, Boos v Barry, 485 US 312, —, 108 S Ct 1157, 1163; Metromedia, Inc. v San Diego, 453 US 490, 519; Carey v Brown, 447 US 455, 462, n 6; see also, Finzer v Barry, 798 F2d 1450, 1469 [Bork, J.]). Accordingly, even if Islip’s ordinance is viewpoint-neutral, "strict scrutiny” is still required because "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content” (Police Dept. v Mosley, 408 US 92, 95). I also disagree with the majority’s conclusion that Islip’s ordinance is viewpoint-neutral. The expression represented in appellants’ store clearly carries with it a message in favor of relaxed sexual mores. Here, unlike cases involving political speech, the specific view is inextricably intertwined with the entire category. Thus, Islip’s ordinance affects both an entire category of speech and a particular viewpoint (see, Stone, Restrictions of Speech Because of its Content: The Peculiar Case of Subject-Matter Restrictions, 46 U Chi L Rev 81,111-112 [1978]).

. The majority’s suggestion that the purpose of Islip’s ordinance is similar in principle to statutes forbidding the sale of child pornography because of the "harm to the juvenile participants rather than [the] harm to viewers of the pornography” (majority opn, at 557-558), ignores the fact that child pornography is excluded from the protections of the First Amendment (New York v Ferber, 458 US 747). Here, by contrast, in the absence of a judicial finding of obscenity, appellants’ speech is completely protected by the First Amendment. Thus, reliance on Ferber is misplaced.

. Professor Stone states: "If taken seriously, and extended to other contexts, the Court’s transmogrification in Renton of an expressly content-based restriction into one that is content-neutral threatens to undermine the very foundation of the content-based/content-neutral distinction. This would in turn erode the coherence and predictability of first amendment doctrine. One can only hope that this aspect of Renton is soon forgotten.” (Stone, Content-Neutral Restrictions, 54 U Chi L Rev 46, 116-117 [1987]; see, Tribe, American Constitutional Law § 12-3, at 798, n 17 [2d ed] ["Carried to its logical conclusion, the doctrine could gravely erode first amendment protections.”].)

. It is for exactly this reason that I cannot simply accept that the predominant purpose of the ordinance is to eradicate the secondary effects of adult businesses and not to suppress speech because of its content (see, majority opn, at 553, n 3). In addition, the fact that appellants "did not seek a trial to establish a contrary motive” (majority opn, at 553, n 3) is of no legal consequence. I find it unnecessary to challenge, and prove, that legislators enacted an ordinance for the purpose of suppressing speech. Indeed, traditional content-based jurisprudence simply avoids this "proof’ problem by presuming improper motive.

. I also disagree with the majority’s oversimplification of content-neutral jurisprudence. The majority states that content-neutral restrictions "are valid if the governmental interest to be achieved outweighs the resulting interference with free expression.” (Majority opn, at 557.) I do agree that expression, whether oral or written, or symbolized by conduct, is subject to reasonable time, place, or manner restrictions. However, such restrictions are "valid provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information” (Clark v Community for Creative Non-Violence, 468 US 288, 293; City Council v Taxpayers for Vincent, 466 US 789; United States v Grace, 461 US 171; Perry Educ. Assn., v Perry Local Educators’ Assn., 460 US 37, 45-46). By refusing to actually apply such standards, the majority’s analysis can lead to the "balancing” away of First Amendment protections.

. This test, normally applied to "symbolic speech”, states that: "[A] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.” (Id., at 377.)

. In both Young and Renton prior nonconforming uses received the protection of a grandfather clause.

. In Young, for instance, adult-uses were dispersed throughout all commercial districts, not only the industrial districts.

. The majority’s suggestion that the "judiciary are hardly authorities on zoning and planning competent to frame broadly based provisions of an ordinance sufficient to meet the needs of the community” (majority opn, at 560) ignores the fact that the judiciary is well equipped and, indeed, required to closely scrutinize zoning ordinances which impact upon constitutional rights (see, Baer v Town of Brookhaven, 73 NY2d 942; McMinn v Town of Oyster Bay, 66 NY2d 544). Such a duty manifestly includes the power, and ability, to review a town’s corrective actions to determine whether such a zoning ordinance is constitutional. If the proper jurisprudential analysis includes an examination as to whether the least restrictive means were employed, it is our duty to closely scrutinize the ordinance to ensure that the legislature has chosen such means. If an equally effective and less burdensome alternative exists, that option must be chosen. This is not simply second-guessing the Town, as suggested by the majority.